161 F.3d 992
 50 Fed. R. Evid. Serv. 1037
 UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph MALISZEWSKI (95-1817); Dean Allen LaBeff (96-1029);
Yolanda Villareal (96-1659); Scott Maliszewski (96-1663);
Pepe Villareal a/k/a Jose Villareal (96-1800); John
Briguglio (96-1935); Nicholas Amador, Jr. (96-1936); and
Edward Maliszewski (96-2123), Defendants-Appellants.
 Nos. 95-1817, 96-1029, 96-1659, 96-1663, 96-1800, 96-1935,
96-1936 and 96-2123.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 28, 1998.
Decided Dec. 8, 1998.
 
 Janet L. Parker, Assistant U.S. Attorney (argued and briefed), Bay City, Michigan, for Plaintiff-Appellee.
 Thomas J. Plachta, (argued and briefed), Brady & Plachta, Bay City, Michigan, for Defendant-Appellant Joseph Maliszewski.
 Dean Allen LaBeff, Morgantown, West Virginia, pro se, Arthur M. Fitzgerald (argued and briefed), Bay City, Michigan, for Defendant-Appellant LaBeff.
 David G. Myers (argued and briefed), Caro, Michigan, for Defendant-Appellant Yolanda Villareal.
 Robert A. Betts (argued and briefed), Caro, Michigan, for Defendant-Appellant Scott Maliszewski.
 Gary J. Crews (argued and briefed), Caro, Michigan, Pepe Villareal, Elkton, Ohio, pro se, for Defendant-Appellant Pepe Villareal.
 Stevens J. Jacobs (argued and briefed), Bay City, Michigan, for Defendant-Appellant Briguglio.
 James F. Gust (argued and briefed), Jan Armon (briefed), Saginaw, Michigan, for Defendant-Appellant Amador.
 Russell L. Perry, Jr. (argued and briefed), Saginaw, Michigan, for Defendant-Appellant Edward Maliszewski.
 Before: JONES, RYAN, and MOORE, Circuit Judges.
 OPINION
 RYAN, Circuit Judge.
 
 
 1
 This case concerns a wide-ranging marijuana-distribution conspiracy spanning three states and involving two families as well as various hangers-on. Of the defendants whose appeals are before us today, two--Joseph Maliszewski and Dean LaBeff--pleaded guilty, and challenge various factual findings made by the district court with respect to their sentences. The remainder--Yolanda Villareal and her husband Pepe Villareal; Scott and Edward Maliszewski, Joseph Maliszewsi's brother and father, respectively; John Briguglio; and Nicholas Amador Jr.--were convicted following a jury trial, and raise numerous challenges both to the conduct of trial and to their sentences.
 
 
 2
 Because the Maliszewski defendants and the Villareal defendants share last names, we shall, in an effort to minimize confusion, refer to those defendants by their first names. The other defendants, however, we shall denominate by their last names.
 
 
 3
 For the reasons that follow, we affirm the judgments of conviction of all the defendants, and affirm the sentences of all, with one exception. We vacate Amador's sentence because the district court clearly erred in assessing the quantity of drugs for which Amador was accountable.
 
 I.
 
 4
 The details of the charged conspiracy will, in large measure, be discussed in connection with the defendants' specific assignments of error. We provide here simply a brief overview to orient the reader.
 
 
 5
 The conspiracy began, at the latest, by Thanksgiving 1992. Humberto "Beto" Sanchez began bringing 30- to 50-pound loads of marijuana from Texas to Michigan, usually traveling via Chicago. At trial, his wife and coconspirator, Annie Mireles, testified that she made her first trip in connection with the conspiracy in December 1992. Mireles and Sanchez traveled to Chicago, obtained 50 pounds of marijuana there, and met defendant Scott Maliszewski. These three then traveled together by train to Saginaw, Michigan, where Scott lived with his father, brother, and sister, defendants Edward, Joseph, and Jamie Maliszewski, respectively. When they arrived in Michigan, they were met at the train station by defendant Nicholas Amador Jr., who joined them in taking the marijuana to the Maliszewski household. There, the marijuana was broken down and repackaged into pound quantities. Some of the repackaged marijuana was taken by Amador, while the Maliszewskis retained the rest.
 
 
 6
 There is no evidence that Edward Maliszewksi was ever involved hands-on with repackaging or distributing the marijuana. There was evidence, however, that on the many trips taken by the coconspirators between Texas and Michigan, Edward acted as financier, renting cars and paying for hotel rooms for various players.
 
 
 7
 Sanchez and Mireles soon met other Michiganians beyond Amador and the Maliszewskis. In February or March 1993, they met defendants Yolanda and Pepe Villareal at a party at Amador's house. Thereafter, Yolanda and Pepe began distributing marijuana for Sanchez and Mireles. In addition, John Briguglio became involved in the conspiracy through Amador, occasionally storing cash at his house and later dealing directly with Sanchez to obtain and distribute marijuana on his own. Amador, however, withdrew from the conspiracy in the summer of 1993, due to, according to the government, a poor record of paying for the marijuana supplied by Sanchez.
 
 
 8
 Another member of the conspiracy was Mireles's mother, Anita Delacruz, who lived in Texas. Delacruz met some Michigan members of the conspiracy in Texas, and at times traveled to Michigan herself. She participated in delivering marijuana to Michigan and in collecting the proceeds.
 
 
 9
 During the summer of 1993, another of Mireles's family members, her brother Guillermo "Willie" Galvan, became involved in the conspiracy. He began operating as a courier for another brother, Jesse Nino, delivering marijuana from Texas to Chicago, where Nino would recover it and take it to Michigan. Later, however, early in 1994, Galvan began making trips to Michigan on his own.
 
 
 10
 One particular incident during the course of conspiracy that takes on significance for various of the defendants' appeals occurred in late 1993. In June, Jesse Nino arrived in Michigan with 30 pounds of marijuana, intending to deliver it to Joseph Maliszewski. Joseph, however, was not in Michigan at the time, and Scott consented to take the marijuana and try to distribute it. Scott, however--who was portrayed by the government as something of a buffoon--sold some of the marijuana, but could not collect the money for it, and smoked or lost the remainder. As a result, Scott was unable to pay Nino for the marijuana Nino had fronted to him. Predictably, Nino was unhappy about this situation, and in November 1993, Scott was informed that armed individuals had arrived in Saginaw in order to settle this debt. Scott therefore holed up in the television dealership store owned by his father, Edward, and Edward's brother-in-law, Herb Akin. With Scott were his friend, defendant Dean LaBeff, and his brother Joseph, and some firearms. This incident ended more or less peacefully, thanks to the intervention of the local SWAT team.
 
 
 11
 In May 1994, a wrench was thrown into the smooth operation of the conspiracy when Sanchez was shot and killed by yet another of his wife's brothers, Oscar Galvan. The leadership void was filled, however, by Willie Galvan, who appears to have taken over as the head of the Texas end of the conspiracy. Deliveries of marijuana from Texas to Michigan quickly resumed.
 
 
 12
 The conspiracy eventually unraveled in July 1994. Mireles sent a shipment of marijuana to Michigan disguised as a package of computer parts; she used Airborne Express as the shipper. It was Mireles's intention to pick up the package herself, but she was unable to do so when her flight was delayed in Chicago. She therefore called Joseph, who said he would arrange to have someone pick up the shipment. There was great reluctance, however, to pick up the package, because the Michigan members of the conspiracy felt this new method of shipping marijuana involved greater risk. A further complication resulted when Airborne Express mistakenly delivered the package to a Computerland store, rather than holding it for pick-up at the Airborne Express office as Mireles had requested. A Computerland employee opened the box, discovered the marijuana, and called law enforcement officials, who promptly set in motion a plan to nab whoever came to pick up the package.
 
 
 13
 That person was Edward. The people at Computerland, however, told him that the package had been returned to Airborne Express. Joseph, rather than Edward, then went to Airborne Express but was told that the package would not be available until after 3:00 p.m. He therefore later returned, this time with Mireles. The two were armed with paperwork that Edward had prepared in the hope of lending credence to a claim, if discovered, that Joseph and Mireles believed the package contained computer parts. They retrieved the package without encountering any resistance, however, and returned with it to the Maliszewski house.
 
 
 14
 Their success was short-lived, though, and Joseph and Mireles were soon arrested. Seized from Joseph's home was a .25 caliber pistol containing four live rounds of ammunition and a .22 caliber pistol containing three live rounds. One of the firearms was in a cubbyhole above the stairwell to the basement; the other was found in the dining room on top of a china cabinet, and next to it was a small set of scales. Inside the basement were marijuana, scales, materials for repackaging, eight one-pound packages of marijuana, and various other items associated with marijuana trafficking.
 
 
 15
 The original indictment was issued in late August 1994, but this was superseded three times. The final superseding indictment charged all the defendants whose appeals are at issue here with one count of conspiring, between January 1993 and October 1994, to manufacture and possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846. Edward was also charged with one count of traveling in interstate commerce with the intent of promoting a business enterprise involving marijuana, in violation of 18 U.S.C. § 1952, but this count was dismissed at trial on the government's motion. Joseph and LaBeff were both charged with one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), but this count was dismissed at the time they pleaded guilty.
 
 
 16
 Also indicted in connection with this conspiracy were Galvan, Mireles, and Delacruz, all of whom pleaded guilty--Mireles pleading guilty to a Michigan state charge only--and testified for the government at this trial; Jamie Maliszewski, who was acquitted at trial; and Jeff Diltz, an apparently minor player who pleaded guilty but did not testify at trial.
 
 II.
 A. Challenges to the Trial Proceedings
 1. Instructions to the Venire
 
 17
 a.
 
 
 18
 The first assignment of error raised by some defendants concerns a comment made by the district court to the venire during voir dire, when the court was generally describing the case:
 
 
 19
 The case is here--as I said, it's a criminal case. The case is here on an indictment which is a piece of paper describing the charges against these individuals. An indictment is the charge that the government has drawn up against the defendants.
 
 
 20
 ....
 
 
 21
 Originally there were a number of other people charged, and you'll hear--I think there was something like 14 people originally charged in this case--and there are seven that are on trial here. Don't be concerned about why that is, it's often the case that a criminal indictment charges a large number of people, then by the time we get down to trial we have only two or five or seven that are actually going to trial. There are a variety of reasons for that, some of which you'll learn in the course of this trial.
 
 
 22
 One reason is that some of these people have already settled their cases by pleading guilty. And there are other reasons as well, I suppose, which again you may well hear about. But even if you don't, you don't need to be concerned about it.
 
 
 23
 (Emphasis added.) The court added the following caution later:
 
 
 24
 Although we have seven individuals charged in this conspiracy, all of them being tried in one trial, it is as though there are seven separate trials because the evidence must apply, in the view of the jury, to each individual person considered separately before the jury is authorized to convict any individual person.
 
 
 25
 So, in other words, it's not an all or nothing affair. This is not a case in which all people must be convicted or else all must be found not guilty. Each person must be weighed individually and the evidence concerning that person must be weighed individually by the jury during the course of the trial and in the jury's deliberation.
 
 
 26
 At the time of the court's reference to the guilty pleas of codefendants, none of the defendants objected. On the third day of trial, however, Edward Maliszewski's lawyer made a motion for mistrial on behalf of all the defendants, explaining that on the basis of some basketball-court advice from a friend who had been removed from the venire, he now had reason to think the court's instruction had been prejudicial. Defense counsel stated:
 
 
 27
 [Y]esterday I had a basketball practice, and as the court may recall, my friend who was there, he said to me about his experiences, and [I] did not go to him to try to find anything, your Honor, just basically that this was his quote, if I can give it as clearly as possible: The judge didn't do you guys, referring to the defense people, any favor. He already--he already said all the rest of them pled guilty.
 
 
 28
 My impression from that was that he perceived--and the thing I'm concerned about is his perception, not what the court said or intended because I know the court was only intending to make it clear for the jury, I'm well aware of that. But his perception was that he already told us they were all guilty, all the rest of them already pled guilty, but these few haven't.
 
 
 29
 As a remedy, he asked for a mistrial, or alternatively, a curative instruction. The court stated that it would be "glad to receive" a curative instruction, but nonetheless felt "confident" that there was no error, since the guilty pleas would eventually have been revealed when those coconspirators were called to testify. For reasons that do not appear in the trial record, no defendant ever proffered a curative instruction, and none was given.
 
 
 30
 During the trial, three guilty-pleading defendants--Galvan, Mireles, and Delacruz--testified at length regarding the workings of the conspiracy, and all discussed their guilty pleas during their testimony. None of the defendants requested a cautionary instruction with respect to this testimony that three coconspirators had pleaded guilty, and, as we have said, none was sua sponte given by the district court.
 
 
 31
 b.
 
 
 32
 On appeal, Yolanda, Pepe, Briguglio, Amador, and Edward contend that the district court's instruction left the impression on the venire that the court meant to indicate that all the defendants were guilty but some had nonetheless demanded a trial; that this initial impression fatally tainted the trial, as the reaction of the one venireperson revealed; and that the taint could not have been removed by a curative instruction.
 
 
 33
 A party's failure to make a "timely objection" to a jury instruction results in the forfeiture of his right to challenge that instruction. United States v. Jones, 108 F.3d 668, 672 (6th Cir.1997). Here, the damage which the defendants now allege occurred could have been remedied fairly easily when it occurred--but by the time a complaint was made, there was no way of completely eradicating the harm except by declaring a mistrial. Thus, by failing to timely object, the defendants certainly contributed to the problem of which they now complain, and our review is for plain error only. See United States v. Dedhia, 134 F.3d 802, 808 (6th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 1844, 140 L.Ed.2d 1105 (1998).
 
 
 34
 There are four prongs to the plain error analysis.... Before this court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If those three factors are met, then this court may exercise its discretion to notice a forfeited error (4) if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."
 
 
 35
 Id. (citations omitted).
 
 
 36
 As a general matter, evidence that a codefendant has pleaded guilty to related offenses "is not admissible to prove the defendant's guilt." United States v. Werme, 939 F.2d 108, 113 (3d Cir.1991). Such evidence may, however, be introduced for other, permissible purposes, most frequently in order "to bring to the jury's attention facts bearing upon a witness's credibility." Id. at 114. "Proof that a witness has pleaded guilty or has agreed to plead guilty is highly relevant to show bias, a recognized mode of impeachment." Id. However, when such evidence is admitted, "the party against whom the evidence is offered is entitled to a limiting instruction upon request." Id. "Because evidence of a co-conspirator's guilty plea is extremely prejudicial to the defendant on trial absent such an instruction, compliance with the mandatory duty imposed by [Fed.R.Evid.] 105 [of restricting the evidence to its proper scope] is particularly important." Id.
 
 
 37
 Logically flowing from these propositions is the premise that a district court should not ordinarily inform the jury that indicted codefendants have already pleaded guilty and will not be proceeding to trial. This is true even when the guilty pleas are taken after the trial has begun, and the jury is therefore necessarily aware that some defendants have disappeared from the courtroom; while it is incumbent on the court to allude to the change in the dramatis personae, it is not necessary to give a detailed explanation, and it is appropriate for the court to instruct that the change should be of "no concern" to the jury. Generally, federal courts have been comfortable that such a statement by the trial court makes the problem go away. See United States v. Walker, 1 F.3d 423, 428 (6th Cir.1993); United States v. Daniele, 886 F.2d 1046, 1055 (8th Cir.1989); United States v. Barrientos, 758 F.2d 1152, 1155-56 (7th Cir.1985). And when, as here, the codefendants pleaded guilty prior to trial, we can foresee no need for a district court to alert the jury to their absence--and find it beyond question that there is no justification for informing the jury of the reason for it. See United States v. Hansen, 544 F.2d 778, 780 (5th Cir.1977); United States v. Harrell, 436 F.2d 606, 615-17 (5th Cir.1970). "The prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious." Hansen, 544 F.2d at 780.
 
 
 38
 We have no difficulty in concluding, therefore, that the district court erred in making its comment to the venire. It was unnecessary, and had the very real potential, as the defendants contend, for tainting the jury with the presumption that the defendants who had proceeded to trial were as guilty as their alleged coconspirators. Thus, two of the four prongs of our plain-error analysis are satisfied: there was an error, and it was plain.
 
 
 39
 Nonetheless, we do not think the error merits reversal, because we do not think the district court's error affected the defendants' substantial rights. We note that the remedial course open to the district court short of mistrial, a curative instruction, was requested by the defendants, and then not pursued. The defendants are thus somewhat disingenuous in contending that a curative instruction would have been inadequate, given that they initially indicated to the court that an instruction would be satisfactory. In addition to being disingenuous, they are just plain wrong; a curative instruction would in many instances, including this one, be adequate and appropriate. See Walker, 1 F.3d at 428; Daniele, 886 F.2d at 1055; Barrientos, 758 F.2d at 1156; United States v. Restaino, 369 F.2d 544, 545-46 (3d Cir.1966).
 
 
 40
 In any event, at the time of its initial instructions to the venire, the district court emphasized that the guilt of each defendant was to be weighed separately; this certainly helped to undo some of whatever prejudice may have occurred. Further, as the government emphasizes, the district court correctly observed that the information about the guilty pleas was going to come out anyway, at the time of the three codefendants' testimony. Cf. Hansen, 544 F.2d at 780; Restaino, 369 F.2d at 545. That is, the information regarding the guilty pleas was later elicited for a legitimate purpose without any request by the defendants for a cautionary instruction.
 
 
 41
 Further, even if the third factor of the plain-error analysis were satisfied, this would not be a case in which it would be appropriate for this court to rectify the error, because it is not one that seriously affected the fairness of the proceedings. As the government points out, the error obviously did not result in a fatal bias against the defendants, since the jury did acquit one defendant, Jamie Maliszewski. See Restaino, 369 F.2d at 546 n. 3. Further, an overwhelming amount of evidence was introduced inculpating those defendants who were convicted. Indeed, only Amador makes a claim to the contrary, but he premises his argument on the meritless contention that because none of the seized marijuana was actually attributable to him, the evidence against him was weaker than was the evidence against the other defendants. This observation is unsound; that the defendant be caught red-handed is not a prerequisite to a successful conspiracy prosecution, and it is not incumbent on the government to produce the tangible fruits of the crime in order to prove all the elements of conspiracy.
 
 
 42
 In sum, while the district court's instruction was plainly erroneous, it was not an error that affected the defendants' substantial rights, or that seriously affected the fairness of the trial. It is not, therefore, a basis for reversal.
 
 2. Sufficiency of the Evidence
 
 43
 Yolanda, Scott, Pepe, and Edward all challenge the sufficiency of the evidence to support their convictions. In doing so, all four express their belief either (1) that Rule 29 motions were mistakenly not made at the close of evidence, or (2) that the district court denied the motions without explanation and without allowing the defendants to articulate their positions, but that this episode was not transcribed. In actuality, however, the record reveals that the district court made the following inquiry at the close of the government's case-in-chief:
 
 
 44
 Should I presume each defendant wishes to raise a Rule 29 Notion [sic] and preserve those? That's unanimous, I see. I will deny each Rule 29 motion made. The evidence overwhelmingly supports a conspiracy here. The evidence taken in a light most favorable to the government certainly would allow a most rational finder of fact to conclude that each defendant taken separately knew the conspiracy's main purpose and joined the conspiracy with that knowledge and with the intent to help advance the conspiracy in some measure. Obviously there were different people playing different rolls [sic] at various times, nonetheless, the evidence fairly supports in a light most favorable to the government a conviction if such is to happen with respect to each defendant here....
 
 
 45
 The AUSA interjected to note that the government wished the court to dismiss an interstate-travel count against Edward Maliszewski, but none of the defendants interjected to offer any substantive argument regarding the sufficiency of the evidence. Further, following the close of all the evidence, one of the defendant's lawyers alerted the court to the need to "[r]enew [ ] ... old motions." The court responded: "All motions should be renewed, Rule 29 and whatever else is necessary, is that correct?" After each defense attorney answered yes, the court stated: "So noted, same rulings, no change of circumstances." Again, no attorney attempted to flesh out his client's position.
 
 
 46
 Despite this procedural background, both Scott and Pepe essentially limit their sufficiency challenge to an argument that they were unfairly prohibited from articulating such a challenge during trial. This claim of error is not well-taken for two reasons. First, there was an adequate opportunity for these defendants to articulate their positions--certainly, no one tried to do so and was denied the chance. And second, even if there had not been an adequate opportunity, neither defendant gives any reason to think he had anything of significance to say then, since neither offers anything now.
 
 
 47
 Yolanda and Edward, however, advance more substantive claims. Before addressing them, however, we note that a defendant claiming insufficiency of the evidence bears a heavy burden. See United States v. Wright, 16 F.3d 1429, 1439 (6th Cir.1994).
 
 
 48
 When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.
 
 
 49
 United States v. Riffe, 28 F.3d 565, 567 (6th Cir.1994); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 
 
 50
 Yolanda argues that there was insufficient evidence to convict her because only three witnesses testified against her, and those three were testifying in return for plea bargains, and two other government witnesses called two of the three liars. However, in reviewing a defendant's claim of insufficiency, we draw all available inferences and resolve all issues of credibility in favor of the jury's verdict. See United States v. Smith, 39 F.3d 119, 121 (6th Cir.1994). Thus, Yolanda's attack on the credibility of prosecution witnesses gets her nowhere, and she offers no other basis for thinking that there was insufficient evidence to convict her. We are, in any event, well-satisfied that there was ample evidence showing that Yolanda was, in the government's words, "a major outlet" in Michigan for the marijuana supplied by the Texas end of the conspiracy.
 
 
 51
 Turning to the remaining sufficiency challenge, Edward argues that the government produced no evidence that he agreed to violate the drug laws; he was shown only to have associated with other conspirators, but this was inevitable, since three of them were his children. He concedes that there was evidence that he attempted to pick up the package of marijuana from Computerland, and that he let his sons use his credit cards to rent cars and hotel rooms, but argues that these facts just show his concern for his sons' well-being.
 
 
 52
 The essential elements of conspiracy under 21 U.S.C. § 846 are (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator. See United States v. Elder, 90 F.3d 1110, 1120 (6th Cir.), cert. denied, --- U.S. ----, ----, 117 S.Ct. 529, 993, 136 L.Ed.2d 415, 873 (1996). Edward's challenge is directed to the second prong of the conspiracy elements.
 
 
 53
 The judicial iterations in conspiracy cases of the black-letter law concerning the manner in which a conspiracy may be proved are so familiar and have been repeated so often as to have become a virtual mantra. But we hesitate to omit them here, lest some unwritten rule of judicial review be offended. Hence:
 
 
 54
 " 'Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.' "
 
 
 55
 United States v. Hernandez, 31 F.3d 354, 358 (6th Cir.1994) (citation omitted). " ' "Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." ' " Id. (citation omitted). However, " '[m]ere presence at the crime scene is insufficient' " to show participation. Id. (citation omitted). And " ' "[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." ' " Id. (citation omitted). "It is ... not necessary for the government to prove the existence of a formal agreement; evidence of a tacit agreement or mutual understanding is sufficient to demonstrate a conspiracy." United States v. Lloyd, 10 F.3d 1197, 1210 (6th Cir.1993). And
 
 
 56
 [o]nce the conspiracy itself has been proven to exist, it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise. Such evidence can be inferred from the interdependence of the enterprise.
 
 
 57
 Id. (citation omitted).
 
 
 58
 There was ample proof that Edward had actual knowledge of the conspiracy. There were signs of marijuana trafficking throughout the house, including large packages of marijuana on the kitchen table, and Edward had been told by Akins that his sons repeatedly left marijuana strewn throughout his television dealership. Edward also knew that members of the conspiracy had access to large amounts of cash, despite their lack of any legitimate employment.
 
 
 59
 There was also ample proof that Edward intended to join the conspiracy, and likewise, that his participation went beyond mere presence. Edward did more than merely make his home available as a safe haven; he gave large amounts of money to his sons and other conspirators, including for hotel rooms in the Saginaw area, and on one occasion, gave Joseph $1000 to buy five pounds of marijuana. Edward also rented cars for his sons to use to transport marijuana. There was also evidence that Edward spent more money than he earned from legitimate sources, from which the jury could reasonably infer that he was earning money from the conspiracy. The most damning evidence, however, is of Edward's attempt to pick up the package of marijuana at Computerland, and of his meeting, when unsuccessful, with Mireles, Galvan, and Joseph to discuss the problem of the package. His provision of documents to create a cover story for Mireles and Joseph if they got caught also goes far beyond a benign, hovering fatherly presence. We conclude that the evidence was more than adequate to allow a jury to infer that Edward knew of, intended to join, and participated in the conspiracy.
 
 3. Evidentiary Challenges
 
 60
 a. Coconspirator Admissions under Fed.R.Evid. 801(d)(2)(E)
 
 
 61
 Rule 801(d)(2)(E) states that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay when introduced against the nonoffering party. There are three foundational prerequisites which must be established to admit a coconspirator's statements under Rule 801(d)(2)(E): that a conspiracy existed; that [the] defendant was a member of the conspiracy; and that the declarant's statement was made during the course and in furtherance of the conspiracy. These preliminary matters are findings of fact to be made by the district court pursuant to Fed.R.Evid. 104(a). They must be established by a preponderance of the evidence, and are reviewed only for clear error.
 
 
 62
 United States. v. Breitkreutz, 977 F.2d 214, 218 (6th Cir.1992) (citations omitted). However, "[t]he ultimate legal conclusion is subject to de novo review." United States v. Carter, 14 F.3d 1150, 1155 (6th Cir.1994).
 
 
 63
 Both Edward and Briguglio raise what they contend are 801(d)(2)(E) challenges. First, both contend, as an initial matter, that the district court admitted many statements under Fed.R.Evid. 801(d)(2)(E) without making the requisite factual findings. They are incorrect. During trial, when initially faced with an 801(d)(2)(E) issue during the testimony of the first witness, the district court stated that it was its "practice ... to reserve any final ruling until the conclusion of all government proofs." At the conclusion of the government's case-in-chief, the court made the following general ruling with respect to 801(d)(2)(E):
 
 
 64
 I find in the first place the evidence overwhelmingly shows the existence of conspirators here. The evidence overwhelmingly supports the maker of these various statements produced through the course of this trial as being a member of the conspiracy. The statements in each respect were made during the course of or in furtherance of a conspiracy and all of this I find by a preponderance of the evidence or more.... Each of these statements is permitted because it is not hearsay under 801(d)(2)(E).
 
 
 65
 This was adequate.
 
 
 66
 We turn next to Edward's complaint regarding testimony by Herb Akin, co-owner with Edward of the television dealership, that Joseph and Edward told Akin that Edward had tried to pick up the package of marijuana from Airborne Express. Akin testified that Edward "told [him] about a package," and that "Ed said that he had went [sic] to Computerland to pick up a package for his son Joseph." Edward also "told [Akin] it was marijuana in [the package]." Finally, Akin testified that Edward told him that Edward "had given a ... receipt [from the television dealership] to Joe to show these were computer parts for a customer"; in other words, Edward admitted to helping Joseph concoct a plausible cover story in the event the marijuana was discovered. Akin also testified that Joseph had later--from jail--told him "the same thing" about the receipt.
 
 
 67
 The statements of Edward that were testified to by Akin are non-hearsay under Rule 801(d)(2)(A) because they are the admissions of a party, Edward, offered against him. Edward has no legal basis for complaining of the admission of these statements.
 
 
 68
 Akin's testimony regarding Joseph 's statement, however, is a different matter. This testimony was not objected to at trial, and we therefore review for plain error only. See United States v. Moss, 9 F.3d 543, 554 (6th Cir.1993). Unlike Edward's statement, Joseph's statement was not admissible under Rule 801(d)(2)(A) since Joseph, who pleaded guilty, was not a party at the time of trial. The government urges that it was properly admitted under Rule 801(d)(2)(E), but we find it unlikely that Joseph, speaking after his arrest to someone who was not a coconspirator, was speaking "during the course and in furtherance of the conspiracy," as is required by the rule. Thus, we have some serious question whether the admission of this statement was not, in fact, an "error" that was "plain." We are satisfied, however, that admission of the statement did not, in any event, affect Edward's substantial rights, since it was a minor point and was merely cumulative of the properly admitted testimony regarding Edward's own admissions. See United States v. Thomas, 875 F.2d 559, 562 n. 2 (6th Cir.1989).
 
 
 69
 We turn now to Briguglio's contentions, which require a different analysis. Briguglio argues that "[t]he vast majority" of Mireles's testimony with respect to Briguglio repeated statements made by her dead husband--statements that were admissible only under 801(d)(2)(E). He also argues that this testimony consisted, in any event, of hearsay upon hearsay in violation of Fed.R.Evid. 805, which provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Even if one layer was admissible under Rule 801(d)(2)(E), Briguglio argues, the other layers were not. The government disagrees, arguing that every layer of the contested testimony consisted of Rule 801(d)(2)(E) statements.
 
 
 70
 Briguglio's focus is on Mireles's testimony regarding a trip Briguglio took to Texas without the knowledge of Mireles's husband, Beto Sanchez, who had been Briguglio's supplier. Sanchez told his wife that Briguglio and another friend of Sanchez were "trying to jump him," that is "push[ ] him aside" and "[g]o around him as far as their dealings." Mireles initially testified that she did not know how her husband found out about this plan, but that he "always found out everything that was going on." Later she amended this statement, stating that she remembered that "Pete," who was "one of the sources of the marijuana," told her husband everything. She speculated that Pete had learned it from "Rolando," who was yet another supplier.
 
 
 71
 In determining whether a statement is admissible under 801(d)(2)(E), "the court may consider the contents of the statements themselves in weighing the evidence." Carter, 14 F.3d at 1155. "A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." Id. Finally, "the coconspirator exception to hearsay only requires that the proponent of the testimony show by a preponderance of the evidence that some conspiracy existed, not necessarily the one charged." United States v. Bonds, 12 F.3d 540, 573 (6th Cir.1993).
 
 
 72
 We conclude that Mireles's testimony was correctly admitted, although for slightly different reasons than were offered by the government. Cutting out the middleman supplier, Beto Sanchez, would further the conspiracy objective of making a profit from selling marijuana. Contrary to Briguglio's suggestion, there is no rule that says if some members of a conspiracy talk about getting rid of another member, that conversation is not in furtherance of the first conspiracy, but is instead directed at an entirely new conspiracy. But as the government points out, even if that were the case, under Bonds, the statements would nonetheless be admissible since they would certainly be in furtherance of the new conspiracy. Thus, it is clear that the initial out-of-court statement by Briguglio to Rolando, about "jumping" Sanchez, satisfies the in-furtherance-of predicate of 801(d)(2)(E). It is more difficult to be confident that this predicate was satisfied for the conversations between Rolando and Pete, and Pete and Sanchez, because it is obviously impossible to know with any certainty what anyone's motives were in relaying the information. Rolando and Pete were suppliers, and were members of the conspiracy--Briguglio does not dispute this--making it reasonable to conclude that the conversations were strategic, thereby furthering conspiratorial objectives. Thus, there is no clear error in the district court's findings on that score.
 
 
 73
 We have more difficulty with the conversation between Sanchez and his wife, Mireles, the witness at trial. It is unclear how that conversation could have furthered conspiratorial objectives, even though both were members of the conspiracy. It seems instead that the conversation furthered their own individual objectives, or perhaps furthered nothing at all, but instead was just idle chatter between a husband and wife. Thus, the district court's implicit finding that this conversation was "in furtherance of" the conspiracy was clearly erroneous.
 
 
 74
 The statement does, however, come within the dictates of Fed.R.Evid. 804(b)(3), which provides that when a witness is unavailable for one of various reasons, including death, his statements may be admitted if they were "against interest." This court has outlined three "factors to be considered in determining whether a hearsay statement should be admitted under Rule 804(b)(3) in a criminal case." United States v. Noel, 938 F.2d 685, 688 (6th Cir.1991). (1) The declarant must be unavailable; (2) " 'from the perspective of the average, reasonable person, the statement must have been truly averse to the declarant's penal interest, considering when it was made' "; and (3) " 'corroborating circumstances must clearly establish the trustworthiness of the statement.' " Id. (citation omitted).
 
 
 75
 As to the first of the Noel requirements, it is clear that Sanchez, who at the time of trial had been murdered, was unavailable. As to the second requirement, for Sanchez to say that someone is trying to cut him out of the drug-supply loop is to admit that he is a drug supplier, which is against his penal interest. And third, the circumstances of the statement--a conversation between husband and wife that implicitly inculpates both, and which is repeated by the wife--are corroborative of the trustworthiness of the statement. On this basis, then, we conclude that the statement was admissible, and the district court's reliance on 801(d)(2)(E) was harmless error.
 
 
 76
 b. Tape-recorded Telephone Conversation
 
 
 77
 At trial, the government introduced a tape-recording of a November 1993 conversation between defendant LaBeff and a woman, during a telephone call made by LaBeff from Edward's television dealership. Joseph and Scott Maliszewski were also at the store at the time of the call, and the three were armed and awaiting the drug dealers to whom they owed $25,000 for marijuana that had been fronted to them. In the phone call, LaBeff bragged to the woman that "some dude [just] walked in and we ... nearly shot him."
 
 
 78
 A defense attorney objected to introduction of this entire recording on the ground that it was more prejudicial than probative. He contended that its probative value was nil because the subject was "[o]utside the scope of the conspiracy.... And really critically the issue here is whether or not [the AUSA] can prove foundationally that the drug debt that is being discussed ... was somehow related to this conspiracy." The court noted that the conversation occurred during the time frame of the conspiracy, and further noted that "[t]he conspiracy charged is a conspiracy to traffic in marijuana, [and] it sounds like this is a marijuana debt." Defense counsel responded that there was no evidence of when the drug debt was incurred; the court, however, was not persuaded, concluding that the evidence was "highly probative and ... minimally prejudicial."
 
 
 79
 On appeal, Edward complains that the tape-recorded conversation should have been excluded for lack of relevance, again arguing that there was no evidence whether the drug debt that was the genesis of the armed stand-off in the television dealership was incurred during the course of the conspiracy. There was also, he contends, "no showing that the debt involved anyone even tangentially related to the charged conspiracy." He contends that the tape was prejudicial because it was "fraught with profanity"; further, it just generally "depicts the defendants as bad characters."
 
 
 80
 This dispute concerns Fed.R.Evid. 403, which provides:
 
 
 81
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 82
 Our task in reviewing the district court's Rule 403 decision is to assess whether the court abused its discretion in balancing the probative value of the evidence against its prejudicial attributes. Our review is therefore limited. " 'We must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.' " United States v. Thomas, 49 F.3d 253, 258 (6th Cir.1995) (citation omitted).
 
 
 83
 Edward's argument is meritless. The conversation took place some eleven months after the conspiracy was charged to have begun; two of three people in the conversation were charged as conspirators, and a third conspirator was at the scene. The topic of the conversation is money owed for a large amount of marijuana that had been provided to some of the defendants on a credit basis. Clearly the conversation helps the government prove that the defendants were involved in a conspiracy to possess marijuana with intent to deliver. And profanity notwithstanding, the conversation simply cannot be said to be unfairly prejudicial. In any event, certainly Edward is in a poor position to make such an argument, given that he was not a participant in the conversation and was not even mentioned.
 
 
 84
 c. Limitation of Cross-Examination of Galvan and Mireles
 
 
 85
 Edward next complains that he was wrongly prohibited from two lines of cross-examination. First, he wanted to question Galvan as to whether Galvan thought that a Texas charge of attempted murder would be dropped as a result of his testimony in this case. The AUSA objected, contending that there was no basis for thinking this was the case; the court agreed. Outside the presence of the jury, Galvan testified that he had been charged with attempted murder in Texas, but that the charges were still pending. He further testified that he did not expect any benefit with respect to that charge from testifying in this case. The court then ruled that the defendants would not be permitted to question Galvan on this topic in front of the jury.
 
 
 86
 As a general matter, "[a] proper area of inquiry on cross-examination is a witness' motivation in testifying and possible bias." United States v. Clark, 988 F.2d 1459, 1464 (6th Cir.1993). However, it is within a court's discretion to reject bias evidence on the ground that it is only remotely relevant. See United States v. Phillips, 888 F.2d 38, 41 (6th Cir.1989); United States v. Meyer, 803 F.2d 246, 249 (6th Cir.1986). The government argues that Galvan's proffer demonstrated that cross-examination of Galvan would have revealed nothing in the way of bias, but would have served only the improper purpose of making the jury aware of the charge, which itself had no relevance to this prosecution. We agree. The district court did not abuse its discretion by prohibiting defense counsel from pursuing the proposed line of inquiry.
 
 
 87
 Edward's second complaint is with respect to the cross-examination of Mireles, whom he wished to question regarding a statement allegedly made to her by Joseph, to the effect that Herb Akin attempted to pick up the package of marijuana from Computerland, a line of inquiry he was foreclosed from pursuing. Our review of the record indicates that Scott Maliszewski's attorney was in fact permitted to ask Mireles about this:
 
 
 88
 Q Who did you believe was to--isn't it true you believed that Herb was supposed to pick up a package from Computerland, the package?
 
 
 89
 [AUSA]: Objection, foundation.
 
 
 90
 THE COURT: Overruled.A Yes.
 
 
 91
 Q I'm sorry?
 
 
 92
 A Yes.
 
 
 93
 Q And how was it that you learned that?
 
 
 94
 A Joe Maliszewski told me himself.
 
 
 95
 Q Joe Maliszewski told you himself?
 
 
 96
 A Yes.
 
 
 97
 Q That Herb was supposed to pick the package up from Computerland?
 
 
 98
 A Yes.
 
 
 99
 However, subsequently, outside of the presence of the jury, the AUSA objected to further questions in this regard on the ground that Joseph's statement was inadmissible hearsay. When the court indicated that the statement might be admissible under 801(d)(2)(E), the AUSA pointed out that that rule did not apply since the statement was not being offered against the party who made it. The AUSA also asserted that the statement was not "in furtherance of" the conspiracy, because it was made after Joseph's arrest. The court agreed with this reasoning. The court also rejected an argument that the statement could be admitted under Rule 806, as an attack on the credibility of the declarant of the statement. The court questioned how the statement "would assist the jury in evaluating the credibility of Joe Maliszewski." Defense counsel suggested that it would be an attack on the credibility of Anita Delacruz, who had testified that Edward had gone for the package; the court concluded that this kind of attack would be improper.
 
 
 100
 Edward first argues that the district court wrongly concluded that Joseph's statement was not in furtherance of the conspiracy, and therefore not admissible under 801(d)(2)(E), given that the court had on other occasions concluded that similar statements, although of different substance, were made in furtherance of the conspiracy. This argument, however, gravely misapprehends the nature of Rule 801(d)(2)(E), which requires the offering party to show by a preponderance of the evidence that (1) a conspiracy existed; (2) the party against whom the statement is offered was a member of the conspiracy; and (3) the statement was made in the course of and in furtherance of the conspiracy. United States v. Moss, 9 F.3d 543, 548-49 (6th Cir.1993). Here, the government was the party against whom the statement was offered, and we feel confident that Edward does not mean to suggest that the government was a member of the conspiracy. That fact precludes admission.
 
 
 101
 Next, Edward argues in the alternative, that the statement was admissible under Fed.R.Evid. 806 in order to attack Joseph's credibility, as Joseph had apparently made inconsistent statements. Rule 806 provides that "[w]hen a hearsay statement, or a statement defined in Rule 801(d)(2),(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." We note, as an aside, that in his brief, Edward wrongly suggests that the district court did not understand whose credibility was to be impeached by the admission of the statement. The transcript, however, reveals that the court well understood that under Rule 806, Joseph's statement could only impeach Joseph, the declarant; it was defense counsel who wrongly wanted to use Joseph's statement to impeach Delacruz, who was not the declarant. In any event, Joseph's statement plainly was not being offered to impeach Joseph, which would have served no salutary purpose from Edward's point of view; instead, the readily apparent substantive purpose for admitting the statement was to suggest that it was Herb Akin who tried to pick up the package, and not Edward. Thus, Rule 806 has no bearing on the question.
 
 
 102
 We note that, in any event, one defense attorney was permitted to thoroughly question Mireles on this subject; further questioning by other attorneys would have generated nothing new. Thus, even if there had been an error, which there was not, it would have been harmless. As it was, Edward received something of a windfall, and has nothing to complain of on this point.
 
 4. Sequestration Order
 
 103
 Edward's next argument is that the government violated the court's sequestration order when the AUSA and the case agent met with Galvan during a weekend break in Galvan's testimony. Galvan testified, outside the presence of the jury, that he had spoken to the agent for about 30 minutes, and further, had reviewed a witness-interview memorandum prepared by the agent and had told the agent "what was wrong," substantively, with the memorandum. The district court rejected defense counsel's motion for a mistrial, holding that there was no violation of the sequestration order: "There has been no order entered preventing counsel or the case agent from consulting with witnesses during their testimony, nor even any order preventing counsel from consulting the witness during cross examination." Further, the court concluded, "there is no showing that [the AUSA or the agent] consulted with this witness Galvan for the purpose of coordinating his testimony with the testimony of any previous witness."
 
 
 104
 We review a district court's rulings in a case of alleged misconduct for an abuse of discretion. See United States v. Rugiero, 20 F.3d 1387, 1390 (6th Cir.1994).
 
 
 105
 Edward's argument is premised on the proposition that the contact between Galvan and the agent allowed them to coordinate their testimony. The government points out, however, that the agent did not testify. Thus, Edward's point is moot. To the extent Edward argues that the agent improperly coached Galvan mid-testimony--although it is not at all clear that Edward actually means to advance such an argument--the district court held that contact between the agent and Galvan was not prohibited under the sequestration order, and Edward does not dispute this. His argument, therefore, is in all respects, meritless.
 
 5. Jury Instructions
 
 106
 The last challenge made by any defendant to the conduct of the trial is Scott and Pepe's contention that the district court erroneously instructed the jury on the subject of multiple conspiracies. The district court instructed the jury as follows, and the defendants object to the section of the instructions underlined:
 
 
 107
 The indictment charges that defendants were all members of one single conspiracy, that is, to commit the crime of manufacturing marijuana or either possessing with intent to distribute or distributing marijuana.
 
 
 108
 Some of the defendants may argue there were really two or more separate conspiracies between or among the various defendants to commit various other crimes. If you decide that there was one single conspiracy and the defendant knowingly and voluntarily joined it, that would be sufficient to convict that defendant of the conspiracy charge.
 
 
 109
 If you decide, however, that there were two or more separate conspiracies, then you must consider the evidence relating to each conspiracy separately. And for each one you must decide whether the government has proved a criminal agreement. If the government proves, that is if the evidence proves, that anyone of the two or more claimed conspiracies existed and that a defendant knowingly and voluntarily joined it, that would be sufficient to convict that defendant of the conspiracy charge.
 
 
 110
 If, on the other hand, the government fails to prove any agreement or conspiracy existed, then, of course, you may not find any defendant guilty of the conspiracy charge.
 
 
 111
 In deciding whether the government has proved a single conspiracy, keep in mind that the essence of the conspiracy is the agreement.
 
 
 112
 To prove a single conspiracy, the government must convince you that each of the members agreed to participate in what he knew or she knew was a group activity directed toward a common goal. You must be in agreement on the overall objective for there to be a single conspiracy.
 
 
 113
 However, the single conspiracy does not require proof that all the members knew each other or sat down together or knew what roles all the other members played. Nor does a single conspiracy require proof that all the members joined in the very beginning or the membership of the group stayed the same the entire time.
 
 
 114
 These are all things that you can consider in determining whether there was one single conspiracy or several separate ones, but they are not necessarily controlling.
 
 
 115
 Nor does the existence of different sub groups, even in different places, or the commission of different criminal acts over a long period of time, necessarily mean there were separate conspiracies. These also are things you can consider in determining whether there was one single conspiracy or several separate ones. But again they are not necessarily controlling. What is controlling is whether the government, through the evidence, has proved an overall agreement on a common goal. That's key.
 
 
 116
 (Emphasis added.)
 
 
 117
 Following submission of the case to the jury, one defense attorney challenged the instruction as given:
 
 
 118
 [DEFENSE COUNSEL]: I think in the instruction titled Multiple Conspiracy No Material Variance From The Indictment, paragraph 5 of that states if the government proves that any one of the two or more claimed conspiracies exist, and that a defendant knowingly and voluntarily joined it, that would be sufficient to convict the defendant of the conspiracy charge.
 
 
 119
 THE COURT: That's right. That's exactly right. When there's no material variance, that is exactly the law.... If there was a material variance now, it would be a different circumstance. But I find there's no material variance nor was there any suggestion that there was a material variance in the event there were multiple conspiracies proved in this case.
 
 
 120
 The pattern criminal jury instructions of the Sixth Circuit District Judges Association contain two instructions that are pertinent here: one for multiple conspiracies that constitute a material variance from the indictment, and one for the factors to be used in determining whether there were multiple conspiracies. The use note for the former reads: "This instruction should be used when there is some evidence that multiple conspiracies may have existed, and a finding that multiple conspiracies existed would constitute a material variance from the indictment." Notably, no instruction exists for multiple conspiracies with no material variance, which is what the district court here believed would be the appropriate instruction in this case.
 
 The pattern instructions read as follows:
 
 121
 3.08 MULTIPLE CONSPIRACIES--MATERIAL VARIANCE FROM THE INDICTMENT
 
 
 122
 (1) The indictment charges that the defendants were all members of one single conspiracy to commit the crime of _______.
 
 
 123
 (2) Some of the defendants have argued that there were really two separate conspiracies--one between _______ to commit the crime of _______; and another one between _______ to commit the crime of _______.
 
 
 124
 (3) To convict any one of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to convict.
 
 
 125
 (4) But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy charged in the indictment.
 
 
 126
 3.09 MULTIPLE CONSPIRACIES--FACTORS IN DETERMINING
 
 
 127
 (1) In deciding whether there was more than one conspiracy, you should concentrate on the nature of the agreement. To prove a single conspiracy, the government must convince you that each of the members agreed to participate in what he knew was a group activity directed toward a common goal. There must be proof of an agreement on an overall objective.
 
 
 128
 (2) But a single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members played. And a single conspiracy may exist even if different members joined at different times, or the membership of the group changed. These are all things that you may consider in deciding whether there was more than one conspiracy, but they are not necessarily controlling.
 
 
 129
 (3) Similarly, just because there were different sub-groups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy. Again, you may consider these things, but they are not necessarily controlling.
 
 
 130
 (4) What is controlling is whether the government has proved that there was an overall agreement on a common goal. That is the key.
 
 
 131
 The trial court did not give either of these instructions, but instead, fashioned a third version.
 
 
 132
 We review jury instructions de novo for their accuracy in stating the law. The defendants argue that the instruction given by the district court improperly allowed the jury to convict if it found that any conspiracy existed, as opposed to the one charged by the government; that is, if a defendant was guilty of one of the multiple conspiracies proved by the government, he was thereby guilty of the single conspiracy charged in the indictment. Thus, they argue in essence that there was a material variance between the indictment and the evidence, and that the district court wrongly failed to instruct the jury on this possibility.
 
 
 133
 A variance occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment....
 
 
 134
 ....
 
 
 135
 In order to obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a two-prong test must be satisfied: (1) the variance must be demonstrated; and (2) the variance must affect some substantial right of the defendant.
 
 
 136
 United States v. Manning, 142 F.3d 336, 339 (6th Cir.1998) (citations omitted). The defendants can only prevail on this assignment of error if they can demonstrate "that the evidence presented could 'reasonably be construed only as supporting a finding of multiple conspiracies' rather than the conspiracy charged." Rugiero, 20 F.3d at 1391 (citation omitted).
 
 
 137
 On the one hand, we think it is clear that the jury instruction actually given by the district court was an erroneous statement of the law. Either there was evidence of multiple conspiracies and a possible variance, in which case pattern jury instruction 3.08 should have been given, or there was not, in which case no such instruction should have been given. The district court's invention of a third category, however, created a possibility for confusion that even the court recognized, although it appears to have believed that the confusion was not a problem. In any event, the instruction was not well-conceived. To say that the jury could decide that there were two or more separate conspiracies, and if a defendant knowingly and voluntarily joined either one of those two, that would be sufficient to convict, is just wrong.
 
 
 138
 On the other hand, the error was of no consequence, simply because there was no evidence showing multiple conspiracies. What the evidence indisputably showed was the existence of a drug chain conspiracy. In this context, it is not easy for a defendant to succeed in making a multiple-conspiracy claim. "[I]n determining whether the evidence showed a single conspiracy or multiple conspiracies, it must be remembered that in a drug 'chain conspiracy' ..., 'it is enough that each member of the conspiracy realizes that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.' " United States v. Odom, 13 F.3d 949, 959 (6th Cir.1994) (citation omitted). Thus, " 'a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy.' " Moss, 9 F.3d at 551 (citation omitted). Likewise, " 'a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations.' " United States v. Segines, 17 F.3d 847, 856 (6th Cir.1994) (citation omitted). And " 'the government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy. In ... a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise.' " Id. (citation omitted).
 
 
 139
 In short, the case law makes plain that evidence of multiple players and multiple locales does not equate with evidence of multiple conspiracies. Thus, there was no variance, and no substantial right of the defendants was affected by the erroneous jury instruction.
 
 6. Miscellany
 
 140
 Some defendants have raised, post-briefing, in offhand fashion, issues which they wish us to address in this appeal. We decline to do so, for reasons we shall briefly explain.
 
 
 141
 First, in United States v. Ovalle, 136 F.3d 1092 (6th Cir.1998), this court recently held that the jury selection plan in the Eastern District of Michigan--which was in place at the time of the indictment and conviction of the defendants here--violated the Jury Selection and Service Act, 28 U.S.C. § 1862, and the Equal Protection Clause. Two defendants, Pepe and Edward, have filed letters pursuant to Fed. R.App. P. 28(j), drawing Ovalle to our attention. Neither of these defendants, nor any other defendant, raised a challenge to the jury selection procedures in the district court, or in their briefs to this court. The latter failing would preclude their raising the argument in a Rule 28(j) letter, see Fed. R.App. P. 28(a)(6), 28(j), but the district-court forfeiture is an alternative oversight and it is fatal. See Ovalle, 136 F.3d at 1107; cf. United States v. Tarascio, 15 F.3d 224, 225 (2d Cir.1993).
 
 
 142
 Second, at oral argument in this court, the attorney for Pepe mentioned the Tenth Circuit's recent decision in United States v. Singleton, 144 F.3d 1343 (10th Cir.1998), which held that "promises" made in a plea agreement by an assistant United States attorney in exchange for securing the testimony of a coconspirator resulted in the violation of the anti-bribery provisions of 18 U.S.C. § 201(c)(2). Defense counsel suggested that Singleton has some relevance to this case, since several witnesses in the trial here testified that they did so in the hope that they would receive a lighter sentence. We note, however, that the en banc Tenth Circuit sua sponte vacated the Singleton opinion and granted rehearing on July 10, 1998. But in any event, this is again not an issue that was raised in the district court below, although the defendants were well aware of the plea agreements between the testifying coconspirators and the government, and it is not an issue that was briefed to this court. It would, therefore, be wholly improper to consider the argument in connection with this case.
 
 B. Challenges to the Sentencing Proceedings
 1. Joseph Maliszewski
 
 143
 Joseph Maliszewski entered into a Rule 11 plea agreement, agreeing to plead guilty to the conspiracy count, in return for the government's recommendations that he receive a three-point credit for acceptance of responsibility, and that any sentence should not exceed the midpoint of the applicable range.
 
 
 144
 The plea hearing was held in late January 1995. At the hearing, Joseph testified that his role in the conspiracy was that of "a mule"; his sole function was to pick up the marijuana. He also claimed that he did not become involved in the conspiracy until March or April 1994, as prior to that time, he was in Alabama. With respect to firearms that were found in his house, he claimed that they were not his, but might have belonged to his father, brother, sister, or grandmother, all of whom lived in the house with him.
 
 
 145
 The presentence report recommended a base offense level of 26, based on the conclusion that 100 to 400 kilograms of marijuana were involved. See U.S.S.G. § 2D1.1(c)(7). A two-level increase was recommended based on the presence of firearms, see id. § 2D1.1(b)(1), and another two-level increase was premised on the defendant's alleged mid-level role in the offense, see id. § 3B1.1(c). Three points were deducted for acceptance of responsibility, see id. § 3E1.1(a) & (b), with the proviso that "the Court may wish to examine this issue closer [sic]," for a total offense level of 27. When combined with a criminal history category of I, the applicable range was 70 to 87 months, with a midpoint of 79.
 
 
 146
 Joseph filed objections to the PSR. First, he "denie[d] that he played an integral role in the conspiracy," alleging that he had not been part of the conspiracy for a five month period, between May and September 1993, which he felt demonstrated that he "was not an integral member of the conspiracy as it continued without his input or services for over 5 months." He also asserted that he did not have a "sales staff" to whom he sold, but only "2 or 3 people he would sell to on occasion." And he contended that he was only "the mule," "a low man," not "an integral man." Next, he argued that the five-month hiatus during which he resided in Alabama should be a period for which he should not be held responsible for amounts sold: "As the Defendant was out of the state for half a year, and his ties to the conspiracy were completely severed during this period of time, he is entitled to a five month reduction of the 326.59 kilogram figure." And third, he contended that he should not be held responsible for "[t]he two small firearms found at [his] father's residence."
 
 
 147
 At sentencing, the district court first considered Joseph's argument that he had not played "an integral role in the conspiracy," and concluded:
 
 
 148
 The investigation material in a general sense shows that the Defendant was, in fact, an organizer and importer of large quantities of marijuana, that he recruited people to sell for him, to transport for him, and it is amply supported that the Defendant was--I don't know. There may be a phrase that could be used more strongly suggesting the Defendant's involvement than to say he was an integral part. It seems to me that he was at the center of the entire operation.
 
 
 149
 The court also noted that although the defendant stated "that he did not have a sales staff[, t]hat's just quibbling about terminology.... Certainly this Defendant did have a sales staff, those people who would distribute marijuana for him." In sum, Joseph "was an integral part of this criminal conspiracy and thus was intimately intertwined in the workings of this ... plan. It was, in essence, his plan."
 
 
 150
 With regard to Joseph's assertion that he could not be held accountable for any marijuana amounts during the period he was in Alabama, the court noted that "he was in Alabama ... hiding from competitors," and that although "he absconded from Michigan and lived more or less undercover or in hiding for a period of time doesn't mean that he's not responsible for the continuing activities of the conspiracy," especially given that he had "set [the conspiracy] into motion" in the first place, and yet never renounced the conspiracy or otherwise attempted to terminate it. The court then questioned whether there was any objection regarding drug quantification apart from the Alabama issue, and defense counsel responded that a further point was that, as a non-central figure, Joseph did not have knowledge of all the drugs; he conceded, however, that "the Court had addressed" that argument. The court then clarified that it relied on information from codefendant LaBeff that the conspiracy was responsible for the distribution of 30 to 60 pounds of marijuana a month, which it found to be a reasonable estimate. It used the smallest figure, 30 pounds, and "multiplied by the 24 month salient time period"--that is, including the period during which Joseph was in Alabama--and held Joseph responsible for 325 kilograms. It noted, however, that even if it omitted the marijuana distributed during Joseph's Alabama sojourn, the amount for which Joseph would be accountable was 113 kilograms, which was within the same guideline range.
 
 
 151
 Finally, the court turned to the firearm issue. The court concluded that the evidence was clear that two pistols were found at the defendant's house, both containing live ammunition. It found that the evidence
 
 
 152
 amply supports the government's view of the placement of these guns. The placement that they were found--the fact they were loaded with live ammunition, the fact that the proximity of drug, drug packaging and repackaging equipment indicates that very well that these weapons both were in a position to protect drugs and drug proceeds and the drug packaging operation.
 
 
 153
 The court then noted that it would credit Joseph for acceptance of responsibility, based on what it found to be "very slim" evidence of it. It explicitly noted that it was "not impressed with his ... truthfulness and the accuracy of his statements." Indeed, the court noted that the defendant came "very close to frivolously contesting the relevant conduct of the offense of conviction."
 
 
 154
 Joseph was sentenced to 79 months' imprisonment, which was the midpoint of the applicable range and the highest amount provided for in the plea agreement.
 
 
 155
 a. Role in the Offense
 
 
 156
 Joseph first argues that the enhancement for his role in the offense was unjustified because he testified at his plea hearing that he was just a mule. We do not oversimplify his argument; that is all there is to it.
 
 
 157
 The sentencing guidelines provide that a sentence should be adjusted in accordance with the defendant's role in the offense, taking all relevant conduct into account. See U.S.S.G. Ch. 3, Pt. B, intro. comment. The aggravating-role provision reads as follows:
 
 
 158
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 159
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 160
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 161
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 162
 U.S.S.G. § 3B1.1. The commentary to this section provides:
 
 
 163
 Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 164
 Id., comment. (n.4). " 'A district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous.' " United States v. Washington, 127 F.3d 510, 515 (6th Cir.1997) (citation omitted), cert. denied, --- U.S. ----, 118 S.Ct. 2348, 141 L.Ed.2d 2718 (1998).
 
 
 165
 Thus, the distinguishing characteristic of a 3B1.1 adjustment is the defendant's leadership of others. While much of the proof offered by the government in support of this enhancement related to Joseph's supervision over the administrative details of the conspiracy, it is also clear that the district court made sufficient findings that Joseph supervised people. The district court found that Joseph "dealt with a variety of sources," and noted that while Joseph may not have had a "sales staff," he did have people who distributed marijuana on his behalf. Moreover, many of the other factors spelled out in the commentary were addressed by the district court, which findings are supported by ample evidence. As should be clear, the mere fact that Joseph testified that he was merely a mule, not a leader, is not enough to counter the evidence to the contrary, especially in light of the district court's finding that Joseph lacked credibility.
 
 
 166
 b. Possession of a Firearm
 
 
 167
 Joseph next argues that he was wrongly assessed points for possessing a firearm. We review for clear error the district court's finding that the defendant possessed a firearm during a drug crime within the meaning of U.S.S.G. § 2D1.1(b). See Elder, 90 F.3d at 1133.
 
 
 168
 A specific offense characteristic under the guideline for conspiracy to unlawfully manufacture or traffic in controlled substances is the possession of a dangerous weapon, which calls for a two-level enhancement. See U.S.S.G. § 2D1.1(b)(1). The application notes explain:
 
 
 169
 The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 170
 Id., comment. (n.3).
 
 
 171
 Thus, in order for the two-level increase to apply, all that the government need show is that a firearm was possessed, and that it is not clearly improbable that it was possessed in connection with the offense. See United States v. Kincaide, 145 F.3d 771, 784 (6th Cir.1998). Considering only the gun that was located at the top of the basement stairwell--since only a single gun is needed to merit the two-level increase--it was, obviously, "possessed." The only bases for the defendant's contention that it is clearly improbable that this gun was connected to the offense are that (1) other people lived in the house; (2) the gun was not registered to him; and (3) most conspiracy activity took place in the basement and the gun was not found in the basement. Points (1) and (2) are irrelevant to the inquiry; neither factor makes it more or less probable that this gun was possessed in connection with his drug offense. Point (3), on the other hand, actually makes it more probable rather than less. Given that the bulk of the drug-processing activity was located in the basement, a concealed place over the basement stairs would be an ideal location to stash a firearm one wished to use to protect those drugs.
 
 
 172
 c. Quantity of Drugs
 
 
 173
 Under U.S.S.G. § 2D1.1(c)(7), a defendant who is responsible for at least 100 kilograms but less than 400 kilograms of marijuana has a base offense level of 26; the 325 kilograms attributed to Joseph falls within this range. Joseph argues, however, that because he testified that he did not join the conspiracy until March 1994, the district court was precluded from holding him responsible for any marijuana that was attributable to times prior to March 1994. We review for clear error the district court's finding as to the quantity of drugs attributable to a defendant. See United States v. Charles, 138 F.3d 257, 267 (6th Cir.1998).
 
 
 174
 We find nothing in the record to suggest that Joseph ever argued in the district court that he did not join the conspiracy until March 1994, as a basis for reducing the amount of drugs attributable to him. It is true that he made a statement to this effect during the plea hearing, but at sentencing, his only argument was that he was not involved in the conspiracy for a five-month period; this argument, and his related request that five months' worth of drugs be deducted from the total attributed to him, is at odds with his current claim that he should have a much greater deduction. As the district court explicitly recognized, even accepting Joseph's five-month claim, he is still accountable for more than 100 kilograms, and the base offense level of 26 is still warranted. But just because his first argument didn't garner him any sentencing benefit does not mean he can now comb through the record to find shreds of factual support for a newly conceived argument. Cf. Cissell Mfg. Co. v. United States Dep't of Labor, 101 F.3d 1132, 1142 (6th Cir.1996). Therefore, we reject this challenge to the quantity of drugs attributed to him.
 
 2. Dean LaBeff
 
 175
 Dean LaBeff entered into a Rule 11 plea agreement in August 1995. In return for LaBeff's agreement to plead guilty to one count of conspiring to manufacture and possess marijuana with intent to distribute, the government agreed that he was entitled to a three-point reduction for acceptance of responsibility, and that any sentence would not exceed the midpoint of the applicable range.
 
 
 176
 At the plea hearing, LaBeff provided the following factual basis for his plea:
 
 
 177
 Me and--well, I got out of jail in April [1994], and I helped Joe [Maliszewski] distribute a pound, and then after that I went down to Texas and me and Willie [Galvan] transported another 25 pounds back to Michigan.
 
 
 178
 He testified that while the 25 pounds was obviously more than could have been intended for personal use, it was not his intention to help out with the actual sale; he had agreed only to transport it, bringing five of the 25 pounds in a suitcase when he flew to Chicago. He claimed he never transported marijuana on any other occasion, and that his only "involvement ... with marijuana back in Michigan" was to smoke it. He acknowledged, however, that on the same occasion that he helped distribute a pound, he also helped Joseph Maliszewski by keeping "an eye on things" while Joseph took a trip to Las Vegas. Finally, he acknowledged that at the time of his arrest, he was storing 10 pounds for Joseph, but he claimed that was part of the same 25 that he helped transport from Texas.
 
 
 179
 The PSR recommended that LaBeff receive a base offense level of 26, based on his responsibility "for ten months at 30 pounds per month and two months at 40 pounds per month totalling 380 pounds or 172.36 kilograms of marijuana." The resulting recommended guideline range was 78 to 97 months.
 
 
 180
 LaBeff objected to the amount of marijuana attributed to him, and at the sentencing hearing, the government presented evidence and testimony designed to establish the beginning date of LaBeff's involvement in the conspiracy. First, the government presented the November 1993 tape-recorded telephone conversation, discussed previously, during which LaBeff bragged that "some dude [just] walked in and we ... nearly shot him." The government also introduced a statement made by LaBeff following his arrest that he had known the Maliszewskis since childhood, and that the Maliszewskis had been involved in the distribution of marijuana for several years. LaBeff "further stated that he has been present when JOE and other members have sold Marijuana over the last couple of years, begin [sic] approximately 1,000 times in those deals. Each time over the two years DEAN LABEFF states that this group of conspirators deal [sic] in 30 to 60 lbs. per month." LaBeff also described in detail the way marijuana was "usually" packed in order to transport it from Texas.
 
 
 181
 LaBeff, however, testified during the hearing that while he had known for about a year prior to his arrest that the Maliszewskis were drug dealers, he knew this only because they were his suppliers, and he did not become involved in the business of distribution until April 1994. When questioned by the AUSA, he simply claimed not to remember or recognize the taped phone call from the incident at the television dealership; indeed, he answered "[n]ope" when asked if he "recall[ed] an incident when [he was] there with some firearms."
 
 
 182
 Also at the hearing, coconspirator Guillermo Galvan testified that he met LaBeff a few months before his July arrest, having been introduced by Joseph. At that meeting, LaBeff allegedly told Galvan that "[h]e wanted to deal directly with" Galvan, and that he wanted to "sell weed" for him. LaBeff also said that he already had customers available, and that he could sell anything Galvan would let him sell. And he told Galvan that he had been "dealing with" Joseph for "about a year," "[s]elling weed bags and just being his partner." Galvan also testified that he had gone to a woman's house with LaBeff, where LaBeff had demonstrated his ability to get customers; they all got drunk and high together, and LaBeff offered to supply "weed" to anyone who wanted it.
 
 
 183
 The district court concluded that LaBeff had been involved in the conspiracy for a year:
 
 
 184
 My conclusion is the defendant was indeed involved with this conspiracy for a period up to a year before this first acquaintance with Mr. Galvan.... I think to some extent it may have been a longer relationship, but that's only to some extent.
 
 
 185
 I think that he was substantially accurate when he told Galvan that he was involved with Maliszewski and actively involved. I think other testimony--other evidence bares [sic] that out, principally the tape recording of the November incident, and the testimony of other individuals, the grand jury testimony, and proffers that have been submitted to the Court for evidence, I mean not specifically about that proffer....
 
 
 186
 And with that, I find that the defendant was involved for a period upwards of a year with this conspiracy, was knowledgeable about the extent of it and was actively assisting in the conspiracy, helping Maliszewski, and he contributed, apparently and had his own customer or customers that he was recruiting, and evidence of that is specifically from Mr. Galvan, that he was at a woman's house. He said her name was Jenny.
 
 
 187
 He said that Mr. LaBeff obviously had a relationship with these individuals. They were glad to see him; he concluded from all of his experience with that, and he was their supplier and he took note of that, as Mr. LaBeff encouraged him to, that he had his own roster of customers and that he could continue to develop--to support his sales efforts if Mr. Galvan would allow him to do that.
 
 
 188
 The court also specifically found LaBeff "to be substantially less than credible, primarily because of the demeanor on the witness stand." In "marked contrast," the court found, was Galvan, "someone who came in from the prison system and who has nothing further to gain ..., but Galvan, unless he is just a grade A actor, which I find no reason to believe, gave testimony which was very coherent and understandable, and with the demeanor that was frankly quite persuasive."
 
 
 189
 The court also declined to award LaBeff three points for acceptance of responsibility, based on its conclusion that he had not been forthcoming on the stand. From a range of 78 to 97 months, LaBeff received a sentence of 80 months' imprisonment.
 
 
 190
 LaBeff argues that the only evidence that he was involved in the conspiracy for a year was the testimony of Galvan and the November 1993 incident. He insists that Galvan's testimony is highly suspect because Galvan felt that his own legal problems stemmed entirely from LaBeff's statements, and there is no evidence that the November 1993 incident is linked with the conspiracy since it occurred eight months before his alleged April 1994 involvement.
 
 
 191
 While the evidence that LaBeff was involved for a year is not impressive, the district court's finding on that score is not clearly erroneous. We have elsewhere observed, in a case where, as here, the defendant challenged the amount of drugs attributed to him, that "the real issue raised by [the] defendant ... is the credibility of [the witness's] testimony, which is an issue that belongs to the finder of fact." United States v. Bingham, 81 F.3d 617, 630 (6th Cir.), cert. denied, 519 U.S. 900, 117 S.Ct. 250, 136 L.Ed.2d 177 (1996); see United States v. Corrigan, 128 F.3d 330, 336 (6th Cir.1997). Thus, the district court's credibility findings are basically unassailable; its observations regarding demeanor and LaBeff's nonresponsiveness are rational and reasonable, and there is no basis for rejecting them. Moreover, the conclusion that Galvan is telling the truth about what LaBeff said, and that LaBeff was telling the truth when he said it, is corroborated by other evidence. Certainly the November 1993 incident is damning, and LaBeff's post-arrest statement--while somewhat ambiguous about the extent and duration of his involvement--is more evidence that he was highly familiar with the workings of the conspiracy.
 
 3. Yolanda and Pepe Villareal
 
 192
 The PSR prepared for Yolanda held her responsible for 129.73 kilograms of marijuana, which carries a base offense level of 26. The PSR for Pepe held him responsible for the same amount, with the same base offense level. This amount was the aggregate of amounts distributed to Pepe individually, to Yolanda individually, and to the two jointly. The PSR noted evidence that the Villareals operated as a unit, and concluded:
 
 
 193
 YOLANDA and Jose VILLAREAL are being held accountable for all of the marijuana listed in the Drug Summary Chart that follows. It is believed that these deliveries occurred during jointly undertaken criminal activity. Each of these transactions was in furtherance of and reasonably foreseeable in connection with the criminal activity YOLANDA and Jose VILLAREAL agreed to undertake.
 
 
 194
 No adjustments were made to the base offense level, and so 26 was also the total offense level. With a criminal history category of I, Yolanda's suggested guideline range was 63 to 78 months. Pepe, however, had a prior felony drug conviction, and therefore was subject to a mandatory minimum sentence of 120 months, pursuant to 21 U.S.C. § 841(b)(1)(B), although his guideline range would otherwise have been 70 to 87 months.
 
 
 195
 The sentencing hearing for the Villareals was held jointly. The defendants argued that they "had separate suppliers, and, in fact, separate delivery systems and places of pickup of marijuana." They therefore took the position that neither should be responsible for the amount delivered to the other. The court rejected the defendants' arguments:
 
 
 196
 It is indeed under 1B1.3 necessary to attribute drug amounts to a defendant, both those drug amounts which were the person's individual responsibility and which represent the activity of others which are both foreseeable to the defendant and in furtherance of the jointly undertaken criminal activity. Here the evidence is overwhelming that Pepe and Yolanda Villareal jointly under took [sic] criminal activities, specifically, the importation and distribution of marijuana in very large quantities and for a substantial period of time.
 
 
 197
 The evidence far beyond a preponderance suggests to the court that these two were not only married and living together but were business partners together.
 
 
 198
 The evidence does not suggest that they had separate business interests, hid their activities from each other and had ... separate sources, separate outlets and essentially separate illegal distribution operations[.]
 
 
 199
 The court also rejected Yolanda's request that she receive a diminished sentence for a minor role in the offense, concluding that Yolanda's "activities were ... widespread and long lasting," and noting "substantial evidence that this defendant ... may have played an organizing role in bringing in other participants, that is, people who provided safe houses, identities and other attributes that assisted in the conspiracy."
 
 
 200
 Yolanda then requested a downward departure on the basis of her "significant family responsibilities," namely, a 6-year-old son with right brachial plexus palsy. The court rejected that request, although recognizing its "authority to consider the proffered grounds for departure." It sentenced Yolanda to 63 months' imprisonment. Pepe received the mandatory minimum sentence of 120 months' imprisonment.
 
 
 201
 a. Quantity of Drugs
 
 
 202
 Yolanda and Pepe both argue that they should not have been held accountable for quantities delivered to each other, because marijuana delivered to the one was not reasonably foreseeable to the other. They take the position that the district court's sole basis for its attribution was the fact of their marriage, and that this is unfair.
 
 
 203
 The district court was certainly entitled to infer from the wealth of trial evidence linking Pepe and Yolanda in illegal activity that each was well aware of the amounts being trafficked by the other. Contrary to their assertions, the district court did not rely on the mere fact that they were married, any more than it relied on the mere fact that the Maliszewskis were related to each other to hold them jointly responsible for certain amounts. Certainly the nature of their relationship, as opposed to the simple fact of their marriage, meets the criteria necessary for a conclusion of reasonable foreseeability. There was no clear error.
 
 
 204
 We note in passing that, in oral argument, defense counsel for Pepe made a suggestion, relying on United States v. Winston, 37 F.3d 235 (6th Cir.1994), that because no single transaction involved more than 100 kilograms of marijuana, he was improperly sentenced to the mandatory minimum required by 21 U.S.C. § 841(b). While it is far from clear that Winston is authority for Pepe's proposition, we decline to address the argument, given Pepe's failure to raise it timely.b. Role in the Offense
 
 
 205
 Yolanda next argues that her base offense level should have been reduced by two points for being a minor participant, because she was less culpable than most other participants. She does not explain why she believes this to be so. We review for clear error the district court's determination that a defendant did not hold a minor role in the offense. See United States v. Latouf, 132 F.3d 320, 332 (6th Cir.1997), cert. denied, --- U.S. ----, ----, ----, ----, 118 S.Ct. 1542, 1543, 1572, 2307, 140 L.Ed.2d 691, 805, 141 L.Ed.2d 165 (1998).
 
 
 206
 U.S.S.G. § 3B1.2 provides that the district court should decrease the offense level by 2 levels if the defendant is a minor participant in the criminal offense. " 'An adjustment is not appropriate in the absence of a finding that the defendant was "substantially less culpable than the average participant" in the criminal enterprise.' " Latouf, 132 F.3d at 332.
 
 
 207
 There was absolutely no basis for the district court to conclude that Yolanda was substantially less culpable than anyone else in this conspiracy. She did what everyone else did: bought and sold marijuana. She has not even attempted to justify her position in her brief, and there is no question that she has not shown the district court's finding to be clearly erroneous.
 
 
 208
 c. Downward Departure
 
 
 209
 Finally, Yolanda argues that the district court should have granted her a downward departure on the basis of her extraordinary family responsibilities. Because it is so indisputably established that this is not a contention reviewable on appeal so long as the district court recognized that it had the authority to depart downward, see United States v. Strickland, 144 F.3d 412, 418 (6th Cir.1998), we shall not address her claim except to note that we reject it.
 
 4. Scott Maliszewski
 
 210
 The PSR prepared for Scott Maliszewski assessed him responsibility for 80 kilograms of marijuana, which carries a base offense level of 24. He was assessed two additional points for possessing a weapon, resulting in a total offense level of 26. With a criminal history category of I, Scott's suggested guideline range was 63 to 78 months.
 
 
 211
 Scott objected to the amount attributed to him, arguing that he was not responsible for various transactions. In particular, he objected to the following paragraph from the PSR:
 
 
 212
 In late February of 1993, Mr. Sanchez went to Chicago in a rental car rented in Joseph Maliszewski's name and brought back 60 pounds of marijuana to Michigan. Subsequently, he took half of the money for that marijuana back to Chicago and SCOTT MALISZEWSKI followed him on the train sometime thereafter bringing the second half of the money from Nicholas Amador Jr. for the 60 pounds of marijuana.
 
 
 213
 Scott took the position that he had only brought money for 30 pounds, not 60 pounds, and thus was responsible for 30, not 60. Next, he objected to the following paragraph:
 
 
 214
 In late June of 1994, Annie Mireles went to Chicago with 30 pounds of marijuana which was destined for Michigan.... Prior to Ms. Mireles' arrival, Anita Delacruz heard a discussion between SCOTT and Edward MALISZEWSKI in which they debated who would pick up Annie Mireles and the marijuana in Chicago.
 
 
 215
 He contended that Joseph, not Scott, went to pick up Mireles in Chicago, and merely debating about whether Scott would go is not enough to attribute 30 pounds to him. Finally, Scott complained about being held accountable for 3,775.9 grams of marijuana seized from his home; he was "a bit player in a large conspiracy; considered to be a 'pest' by the major players," and there was no basis for attributing that amount to him because there was no testimony that he ever sold that marijuana or that he had a stake in that amount.
 
 
 216
 Related to these quantity disputes, Scott insisted that he was entitled to a reduction for acceptance of responsibility. He contended that, prior to trial, he had intended to plead guilty but did not do so because the government wanted to hold him responsible for far more marijuana than was properly attributable to him. In this regard, we take note that an argument raised by Scott's counsel at sentencing--suggesting that the reason Scott had not pleaded guilty was because the district court's plea-agreement procedures precluded the prosecution and the defense from submitting a "sentencing bargain" in which they stipulated to a particular quantity--is simply not implicated by the underlying facts, irrespective of its legal merit or lack thereof. This is not a case in which the prosecution and defense reached a mutual understanding as to quantity, but the district court rejected it, or somehow forbade them from entering a plea agreement memorializing their understanding. This was simply a case in which the prosecution and defense did not agree about what the evidence demonstrated, and because of this, the defendant chose not to plead guilty.
 
 
 217
 The court rejected Scott's contentions with respect to the 60 pounds from February 1993, relying on the trial testimony of Mireles that Sanchez met Scott at the train station and received $30,000 from him in payment for the second half of the 60 pounds, and concluding that Mireles was "consistent, reliable and ... uncontradicted" by anyone other than Scott, who had "every motivation to tell a different story." The trial court also rejected the alternative argument that Scott should only be responsible for part of the 60 pounds, since he only paid for part: "It seems to me that the 60 pounds was attributed to the defendant because he assisted in the distribution of the 60 pounds by virtue of assisting in financial transactions designed to pay for the 60 pounds." With respect to the 30 pounds from June 1994, the court concluded that "[t]he weight of the evidence ... again demonstrates ... that Scott Maliszewski was a participating conspirator. He was part of this conversation," and "was knowledgeable about this upcoming distribution." And with respect to the final amount, seized from the Maliszewski house, the court concluded that during the relevant time frame, Scott "was a willing and at times enthusiastic participant" in the conspiracy, and there was "no evidence that he had withdrawn from that behavior or had given any sign that he no longer wanted to be affiliated with the group"; he was therefore properly held accountable for that amount.
 
 
 218
 Finally, the court rejected the defendant's request for an acceptance-of-responsibility reduction. This was not the "highly unusual case in which a person may go to trial but yet be awarded points," the court observed. It noted, with respect to the plea agreement, that "it's almost universal[ ] that the determination of drug quantity is left for argument at sentencing." Thus, Scott's disagreement with the government about the amount attributable to him was not a basis for going to trial that was consistent with accepting responsibility.
 
 
 219
 The district court sentenced Scott at the low end of the applicable range, to 65 months.
 
 
 220
 a. Quantity of Drugs
 
 
 221
 Scott renews his argument that three amounts of marijuana were wrongly attributed to him, but we disagree. The 60 pounds essentially comes down to a credibility determination, and Scott lost; the court's attribution of this amount to him was, therefore, not clearly erroneous. The amount seized at the house was properly attributed to him given that, as the district court observed, Scott had in no way withdrawn from the conspiracy at the time of the seizure, and was almost certainly aware of the amount since he lived in the house and continued to be involved with all the players. Indeed, although defense counsel for Scott suggested at oral argument that Scott withdrew from the conspiracy after he lost the 30 pounds of marijuana "fronted" to him by Jesse Nino, this is not an argument that was articulated in the brief, and it is not supported by any evidence of record. Finally, the 30 pounds from June 1994 was properly attributed to him by basically the same rationale; he was undeniably aware of the amount, since he was involved in a discussion about it, and he was indisputably a member of the conspiracy at the time.
 
 
 222
 b. Acceptance of Responsibility
 
 
 223
 The sentencing guidelines provide that a defendant is entitled to a two-level reduction in sentence if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "The defendant bears the burden of showing by a preponderance of the evidence that the reduction is justified." United States v. Guthrie, 144 F.3d 1006, 1012 (6th Cir.1998).
 
 
 224
 As explained by a commentary note, a decrease pursuant to this provision
 
 
 225
 is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 226
 United States v. Vincent, 20 F.3d 229, 239 (6th Cir.1994) (quoting U.S.S.G. § 3E1.1 comment. (n.2)).
 
 
 227
 Scott argues that the district court incorrectly limited the acceptance of responsibility reduction for a defendant who went to trial to defendants who wish only to preserve a legal argument; according to Scott, the reduction should also be available when, as here, a defendant admits his guilt but denies the extent of it. The district court did not indicate that the only time a defendant who goes to trial can get the reduction is when he goes to trial in order to preserve a constitutional challenge; it simply stated that this was not the type of extraordinary case that a defendant who does not plead guilty can be said to have accepted responsibility. Thus, Scott's dispute is factual--whether he in fact accepted responsibility--and we will review the district court's findings for clear error. See United States v. Childers, 86 F.3d 562, 563 (6th Cir.1996).
 
 
 228
 Scott made no clearcut statements prior to trial admitting his responsibility, and he did not make any factual stipulations during the trial. Even at sentencing, Scott's expression of remorse and guilt were tepid indeed; he stated only that he felt "pretty bad." And he has consistently denied responsibility for amounts which, as we have found, were properly attributed to him. Indeed, even in this appeal, he has questioned the sufficiency of the evidence supporting his conviction, as indeed he is entitled to do. But there is, in sum, no basis for finding he accepted responsibility, and he certainly has not established that the district court clearly erred in finding that he had not.
 
 5. John Briguglio
 
 229
 The PSR prepared for Briguglio held him accountable for 129.15 kilograms, based on four different transactions: 50 pounds in December 1992 or January 1993; 22.73 pounds in February or March 1993; 100 pounds in August 1993; and 112 pounds in October 1993. This resulted in a base offense level of 26; because no adjustments were made, 26 was also the total offense level. When combined with a criminal history category of II, the suggested custody range was 70 to 87 months.
 
 
 230
 As far as we can tell from a rather impenetrable brief, Briguglio objects to only one item from the PSR--a 22.73 pound assessment from February 1993:
 
 
 231
 In February 1993, Ms. Mireles and Mr. Sanchez returned to Michigan. In late February or early March 1993, they returned to Texas along with Joseph Maliszewski. They took with them $25,000.00 in cash which they hid in a CD player and in 7-Up placed in a cooler. The money had been stored at JOHN BRIGUGLIO's residence. The packing of the money into the CD player and stash cans was performed by Mr. Sanchez and Nicholas Amador at Mr. Amador's residence.... [I]n this conspiracy, marijuana sold for between $1,000.00 and $1,100.00 per pound. A total of $25,000.00 was divided by $1,100.00 per pound, producing 22.73 pounds of marijuana.
 
 
 232
 At sentencing, the dispute with respect to this money focused on the fact that Mireles testified simply that the money had come from "John," without specifying his last name. But another John--Johnnie Gonzales--was also involved in the conspiracy. Further, Mireles did not specifically testify at trial that it was $25,000, but only that it was "[t]housands of dollars." However, the court, reviewing Mireles's grand-jury testimony and putting it together with her trial testimony, concluded "that the safe house, indeed, was John Briguglio's." It further concluded that "there were two separate occasions," one involving $10,000 and another involving $25,000, and that "on both of those occasions the money came from John Briguglio's house.... And all of it was drug money." The court therefore assessed both amounts against Briguglio, although the $10,000 had not been mentioned in the presentence report. The court further found, following an argument made by the AUSA based on grand-jury testimony, that Briguglio was responsible for 10 pounds for each of four shipments received by Amador; however, this finding was simply an alternative finding justifying the offense level, and it did not affect the guidelines calculations. Briguglio was sentenced to 80 months' imprisonment.
 
 
 233
 We find Briguglio's argument all but incomprehensible. Clearly, he believes the evidence supporting the district court's quantity findings to be unreliable because it was based on hearsay and grand-jury testimony. He concedes that there is nothing unconstitutional about using this type of evidence, but insists that it is nonetheless "wrong." We also understand that he does not view the sentencing guidelines with any favor. But while he has explicitly conceded responsibility for 212 pounds of marijuana--the equivalent of approximately 96 kilograms--we find indecipherable the nature of and grounds for his objection to the finding that he was responsible for the additional four kilograms that resulted in the offense level of 26. We are satisfied, however, that the district court's ultimate conclusion was not clearly erroneous. It was appropriate for the district court to base its conclusions on grand-jury testimony, and the court drew perfectly reasonable inferences from that testimony in combination with the trial testimony. We therefore conclude that Briguglio's sentence should be affirmed.
 
 6. Nicholas Amador
 
 234
 The PSR prepared for Amador assigned him a base offense level of 26, based on responsibility for more than 100 kilograms of marijuana; to be precise, 121.44 kilograms over six separate transactions were attributed to him. Amador took issue with three of the transactions: 60 pounds of marijuana distributed in late February 1993; 22.73 pounds distributed between February and March 1993; and 30 pounds distributed in the summer of 1993. These challenged amounts are equivalent to approximately 27.216, 10, and 13.6 kilograms, respectively. Evidence at trial established that Amador withdrew from the conspiracy sometime prior to August 1993, and no amounts were attributed to him after that time.
 
 
 235
 The PSR described the first of the three challenged incidents as follows:
 
 
 236
 A short time after the trip involving the 100 pounds mentioned above, Mr. Sanchez returned to Chicago in a rental car in Joseph Maliszewski's name and brought back an additional 60 pounds to Michigan. Subsequently, Mr. Sanchez took half of the money for that marijuana back to Chicago on yet another trip between Michigan and Chicago. Scott Maliszewski followed him on the train sometime thereafter, bringing the second half of the money from NICHOLAS AMADOR, JR. for the 60 pounds of marijuana.
 
 
 237
 This conclusion that the money came from Amador was based on the following testimony by Mireles at trial:
 
 
 238
 Q Who was Scott bringing the money from or for?
 
 
 239
 A Nick Amador.
 
 
 240
 Q How do you know that?
 
 
 241
 A Because Nick was the only one--he was the one that was running everything at that time.
 
 
 242
 There was no other evidence purporting to link Amador to that marijuana.
 
 
 243
 The second challenged incident was described in the PSR as follows:
 
 
 244
 In late February or early March 1993, Ms. Mireles and Mr. Sanchez returned to Texas along with Maliszewski. They took with them $25,000.00 in cash which they hid in a CD player and in 7-Up stash cans placed in a cooler. The money had been stored at John Briguglio's residence. The packing of the money into the CD player and stash cans was performed by Mr. Sanchez and NICHOLAS AMADOR at MR. AMADOR'S residence.... [I]n this conspiracy, marijuana sold for between $1,000.00 and $1,100.00 per pound. A total of $25,000.00 was divided by $1,100.00 per pound, producing 22.73 pounds of marijuana.
 
 
 245
 Finally, the third challenged incident was described as follows:
 
 
 246
 During the summer of 1993, Guillermo Galvan acted as a courier for one of his brother's [sic], Jessie [sic] Nino. Mr. Galvan carried 30 pounds of marijuana from Texas to Chicago by train. Mr. Nino then took the marijuana by rental car from Chicago to Michigan. Mr. Nino told Mr. Galvan that the marijuana was taken to NICHOLAS AMADOR, JR.
 
 
 247
 The last sentence of this paragraph is inaccurate. Galvan testified at trial that he "overheard [Nino] talking on the phone saying that the marijuana was for Nicholas Amador" (emphasis added); Galvan himself had no conversation with Nino about it, and he had nothing to do with making the actual delivery.
 
 
 248
 The PSR also assessed Amador two points for possessing a firearm:
 
 
 249
 During the winter of 1993, before Humberto Sanchez was killed, Joseph Maliszewski paid Mr. Sanchez for marijuana with a small silver 9 millimeter gun with a clip and a car. NICK AMADOR took the gun and car from Joseph Maliszewski and had them waiting for Mr. Sanchez when he got to the house. Annie Mireles saw the title to the car and the gun and clip.
 
 
 250
 This description was based on trial testimony from Mireles to the effect that she saw Joseph Maliszewski with a small silver gun that eventually became Beto Sanchez's. According to Mireles, "Joe had owed [Sanchez] some money and [Sanchez] had told Nick Amador to take away the gun and car belonging to Joe." She knew that Amador did as he was told "[b]ecause when [Sanchez and Mireles] arrived on one of those trips to Nick Amador, ... that gray car was there." Further, she later saw "[t]he silver gun ... because [she] remember[s] [Sanchez and she] driving back to Texas and [they] took the gun with us."
 
 
 251
 The total offense level was thus 28, and with a criminal history category of I, the suggested custody range was 78 to 97 months.
 
 
 252
 At the sentencing hearing, Amador testified that he "didn't know nothing about the 60 pounds" described above. With respect to the $25,000 stored in the CD player, he testified that he "knew about the radio, but [he] didn't know what they were putting into the radio." He acknowledged, however, that he had given $25,000 to Sanchez, but stated that this was in payment for another delivery of marijuana that he did not dispute and for which he had already been assigned responsibility. And with respect to the 30 pounds, Amador testified:
 
 
 253
 For one, I know don't know [sic] Galvan. I seen him one time and that was in Texas. I never had contact with him here. He has never came [sic] to my house. I have never seen him personally, and another one, I wasn't even here in the summer of '93. I had already moved to Kalamazoo already.
 
 
 254
 Finally, he claimed to know "[n]othing at all" about the firearm.
 
 
 255
 On cross-examination, he repeatedly denied remembering the names of any of his customers or suppliers, apart from one who was dead. The AUSA used this testimony to argue that he should be assessed points for obstruction of justice.
 
 
 256
 The district court did not assess those points, but stated that it took the government's motion "seriously." It characterized Amador's testimony as "inconsistent, vacillating, perhaps not entirely incoherent, and not entirely credible." The court did indicate, however, that it found Amador's testimony regarding the money in the CD player to be plausible, but noted that deleting that amount would not change the guideline levels. It also noted that Amador himself had conceded that the money in question came from him, and he was therefore responsible for it. With respect to the other controverted issues, the court simply said it rejected everything Amador said, and adopted the findings in the PSR.
 
 
 257
 The court sentenced Amador to the high end of the applicable range, 97 months.
 
 
 258
 a. Quantity of Drugs
 
 
 259
 On appeal, Amador renews his three arguments with respect to quantity. He contends that the 60 pounds was connected to him only by "pure speculation." He argues that Mireles attributed the marijuana to him based solely on her belief that "Nick was ... the one that was running everything at that time," not because anyone had told her he was responsible. Next, he argues that the $25,000 attributed to him is effectively double-counting, because it constituted payment for a portion of a 100-pound delivery that was already attributed to him; further, there is no evidence that the $25,000 went to buy additional marijuana. Finally, he argues that the court should not have relied on the testimony of Galvan, who testified that he heard his brother say the 30 pounds of marijuana was for Amador; Galvan did not deliver the marijuana to Amador, and was not instructed to do so, and did not testify that he knew anyone else had actually done so.
 
 
 260
 "Types and quantities of drugs not specified in the count of conviction [that qualify as relevant conduct] may be considered in determining the offense level." U.S.S.G. § 2D1.1, comment. (n.12); see United States v. Myers, 123 F.3d 350, 364 (6th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 611, 139 L.Ed.2d 498 (1997). The government bears a " 'burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable.' " Charles, 138 F.3d at 267 (citation omitted).
 
 
 261
 In making its determination, the district court " 'may consider relevant information which is prohibited from being introduced into evidence at trial in determining a defendant's sentence.' " Id. (citation omitted). Thus, the fact that the evidence supporting a judge's determination of the quantity of drugs was " 'testimonial and not physical is irrelevant.' " Id. (citation omitted). But "[w]hile the sentencing court need not consider the rules of evidence when making this determination, the evidence must have sufficient indicia of reliability to support its probable accuracy." United States v. Milledge, 109 F.3d 312, 316 (6th Cir.1997) (citations and internal quotation marks omitted). Further, approximations are completely appropriate. See Charles, 138 F.3d at 267. As the guideline commentary states, "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, comment. (n.12). The court should, of course, "exercise caution" when approximating. Charles, 138 F.3d at 267.
 
 
 262
 We conclude that the attribution to Amador of the three amounts he complains about is not supported by competent evidence in the record. See id. It is not simply a matter of a credibility determination that was resolved against Amador, as the government contends. Instead, the question is whether the government has produced any reliable evidence. It is logically possible that Amador's testimony could be rejected as incredible and yet the government not have met its burden of proving the quantity attributable to Amador by a preponderance of the evidence.
 
 
 263
 We conclude that the government has failed to carry its burden. Mireles's statement is the essence of speculation; she did not know who the 60 pounds was going to, but she assumed it was Amador. Amador is correct that there is no evidence that the $25,000 was used to buy additional marijuana, as opposed to being payment for a debt already incurred, and there is nothing to justify such an assumption. And finally, there is no evidence showing that the 30 pounds ever reached Amador. Nino's overheard statement on the phone to an unknown party that Nino intended to give it to Amador is an insufficient basis for concluding that Amador actually got it. Given the dictate that the court err on the side of caution in making this kind of estimate, we conclude that Amador's sentence should be vacated and remanded for resentencing, deducting these amounts.
 
 
 264
 b. Possession of a Firearm
 
 
 265
 Amador also argues that there was insufficient evidence connecting him to the handgun that was seized from Joseph Maliszewski's home. He contends that the only evidence is from Mireles, to the effect that Beto Sanchez had instructed Amador to take Maliszewski's gun away from him. There was no proof that Amador actually did so, and there is no evidence that Amador ever possessed the gun.
 
 
 266
 The evidence in support of Amador's possession of the gun is weak. Mireles testified that Sanchez instructed Amador to get the gun, and later Sanchez had the gun; the lack of evidence directly linking Amador to the gun is troubling. However, we do not think it is possible to conclude that the district court clearly erred in inferring from this circumstantial evidence that Amador was responsible for getting the gun to Sanchez.
 
 7. Edward Maliszewski
 
 267
 A PSR was prepared for Edward assigning him a base offense level of 26, based on a total of 176.21 kilograms of marijuana. The PSR contained a "drug summary table," indicating the amounts of marijuana involved in various transactions; the dates of those transactions; and the testimony establishing that the transactions occurred. Two additional levels were assessed for possession of a firearm, pursuant to U.S.S.G. § 2D1.1(b)(1), which assessment Edward does not dispute on appeal. Finally, two additional levels were assessed for obstruction of justice, pursuant to § 3C1.1, based on the following:
 
 
 268
 EDWARD MALISZEWSKI told various people who were subpoenaed to testify before the Grand Jury, including his daughter, Jamie Maliszewski, Theresa Akin and Herb Akin, that they should testify that they did not know and did not remember in response to questions asked them before the Grand Jury. The Akins, who had been cooperating during the investigation, did not do as EDWARD MALISZEWSKI had requested, but in many respects, Jamie Maliszewski complied with her father's request. Jamie Maliszewski later admitted to the Akins that she had lied before the Grand Jury.
 
 
 269
 The total offense level was therefore 30; with a criminal history category of I, Edward's imprisonment range was 97 to 121 months.
 
 
 270
 At the sentencing hearing, the first issue addressed by the parties was the amount for which Edward should be held responsible. The court highlighted the evidence from trial that it found significant in terms of Edward's knowledge of and responsibility for various transactions, which it summarized as follows:
 
 
 271
 The government's point is that the pervasiveness of the son's [sic] marijuana trafficking, repackaging, association with people bringing marijuana in and out of the house--not just small quantities but multi pound, multi kilogram quantities--for packaging and repackaging, the pervasiveness of this activity and time during which it happened and the relatively small size of the house, the scattering of marijuana throughout the house at levels, upstairs, main floor and basement leaves no reasonable conclusion but that the defendant knew what was going on [as] the government suggests.
 
 
 272
 I think it's a correct statement though that the defendant himself is not shown, through testimony, to have directly participated....
 
 
 273
 I don't know of any testimony that suggests that he directly received or helped in breaking down this material. The point that the government urges here, and the point that the probation department suggests, was that the defendant within reason should have this marijuana attributed to him because he, within reason, knew what was going on.
 
 
 274
 He would have had to have been willfully blind to the situation, in other words, to have not known what was going on.
 
 
 275
 Defense counsel's response conceded that the dispute came down to credibility: "I believe the court has recited things that, if the court decides to give them credibility, it could rest its opinion on."
 
 
 276
 Edward then testified. He said that he was out of state, traveling on business, at the time of some of the conspiracy transactions. He also said that his son, Joseph, had free access to his credit cards, and may have sometimes used the cards without his consent. He asserted that Joseph would sometimes use the credit cards to buy his grandmother, Edward's mother, medicine. He testified that he never tried to pick up the package of marijuana from Computerland. Finally, he testified that he never told his daughter to do anything improper, such as lie to the grand jury. The government cross-examined Edward at length, and also introduced Akin's testimony to the grand jury that Edward had pressured Akin and his wife, as well as Edward's daughter Jamie, to tell the grand jury that they didn't remember anything.
 
 
 277
 The court characterized Edward's testimony as follows: "It was either false denials or wild exaggerations of a kernel of truth." The court explicitly found that it was "not credible ... that a man would own a house, live in it ... [but] would never ever walk down the basement stairs or never go into the upstairs of such a small home as this." The court found Edward's testimony about the package of marijuana to be "inconsistent with a wealth of other testimony," and concluded that "[h]is denial[s] on the stand under oath are utterly unconvincing and are ... false." In sum, "[h]is testimony ... was indeed not only not persuasive but ... substantially false in a number of regards." The court then proceeded to consider each challenged amount attributed to Edward, and rejected the challenges. The court held: "This defendant is being held accountable for conduct not only of his own but the activity of others which was both in furtherance of the jointly undertaken activity and reasonably foreseeable by this defendant." It adopted the findings of the PSR with respect to quantity.
 
 
 278
 The court also considered Edward's challenge to the obstruction of justice enhancement. It concluded that points should be assessed "both for attempting--chiefly for attempting to influence a witness and less significantly for his highly exaggerated and intentionally misleading testimony here this afternoon under oath."
 
 
 279
 Edward received a sentence of 110 months' imprisonment.
 
 
 280
 a. Quantity of Drugs
 
 
 281
 Edward takes the position that because he did not directly receive the marijuana and did not help in repackaging it, he should not be held responsible for it; he contends that there was not sufficient evidence to make him accountable for any of the marijuana attributable to him, and does not take issue with specific transactions.
 
 
 282
 "For sentencing purposes, the government must prove by a preponderance of the evidence the amount of drugs directly attributable to the defendant and 'all reasonably foreseeable acts and omissions of others in furtherance of the' conspiracy." United States v. Gaitan-Acevedo, 148 F.3d 577 (6th Cir.) (quoting U.S.S.G. § 1B1.3(a)(1)(B)), cert. denied, --- U.S. ----, 119 S.Ct. 256, 142 L.Ed.2d 210 (1998). As the government observes, Edward's dispute is, fundamentally, a credibility dispute. He said that he didn't know what was going on in the conspiracy, but the court did not believe him. It held him accountable for various amounts that came into his house, having concluded that he was well aware of those transactions. The reasonable-foreseeability standard applied by the district court was correct, and easily justifies the court's conclusions.
 
 
 283
 b. Obstruction of Justice
 
 
 284
 Edward presents a factual challenge to the district court's obstruction enhancement, contending that he testified that he never tried to influence any witness's testimony before the grand jury, and that he did not try to alter his appearance to avoid recognition as the person who tried to pick up the package of marijuana. This is an argument that occasions clear-error review of the district court's findings. See United States v. Walker, 119 F.3d 403, 405 (6th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997).
 
 
 285
 Section 3C1.1 of the sentencing guidelines provides:
 
 
 286
 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
 
 
 287
 "According to the guidelines, obstruction of justice includes the commission of perjury." Charles, 138 F.3d at 266. If perjury is the basis for the enhancement, however, the district court must specify what statements the defendant made that were perjurious. See United States v. Sassanelli, 118 F.3d 495, 500 (6th Cir.1997). Another example of obstructive conduct warranting the enhancement is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, (n.3(a)). The notes also refer to "committing, suborning, or attempting to suborn perjury." Id., comment. (n.3(b)).
 
 
 288
 Once again, Edward's only challenge is a credibility dispute. Edward says he did not ask anyone to testify untruthfully; Herb Akin says Edward did. The court agreed with Akin, and we have no basis to conclude that the court's finding is clearly erroneous. Alternatively, the court was certainly entitled to conclude that Edward lied outrageously on the witness stand; this is a proper basis for an enhancement, and the court properly pointed to specific examples of what it found to be false statements.
 
 III.
 
 289
 We AFFIRM the judgments of conviction and sentences of Yolanda Villareal, Scott Maliszewski, Pepe Villareal, John Briguglio, and Edward Maliszewski, and AFFIRM the sentences of Joseph Maliszewski and Dean LaBeff. We also AFFIRM the judgment of conviction of Nicholas Amador, but VACATE his sentence and REMAND for resentencing for the limited purpose of deducting the three drug quantities wrongly included in the court's original calculation.