**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marlon PLACIDE, also known as
Hawk Defendant–Appellant,**

**United States of America,
Plaintiff–Appellee,**

v.

**Simone Marie Lowe, Defendant–
Appellant.**

**Nos. 02–5858, 02–5860 and 02–5870.**

United States Court of Appeals,
Sixth Circuit.

Sept. 8, 2004.

Van S. Vincent, Asst. U.S. Attorney, Paul M. O'Brien, Asst. U.S. Attorney, Nashville, TN, for Plaintiff–Appellee.

Dale Quillen, Michael J. Flanagan, Nashville, TN, Julie E. Officer, Livingston, TN, for Defendants–Appellants.

BEFORE: COLE and COOK, Circuit Judges; and SPIEGEL, District Judge.[*]

## OPINION

COLE, Circuit Judge.

On February 22, 2001, Defendant–Appellant Marlon Placide was charged with conspiracy to possess with intent to distribute over five kilograms of cocaine. On March 21, 2001, Placide and Defendant–Appellant Simone Lowe were the subject of an additional indictment charging them with: (1) conspiracy to possess with intent to distribute over five kilograms of cocaine; (2) conspiring to possess with intent to distribute less than fifty kilograms of marijuana; (3) possessing with intent to distribute over five kilograms of cocaine; (4) possessing with intent to distribute less than fifty kilograms of marijuana; and (5) possessing firearms in furtherance of drug trafficking. Placide and Lowe were tried together, convicted of all the charges against them, and now appeal their convictions and sentences. We **AFFIRM**.

## I. BACKGROUND

On October 24, 2000, Stephen Brassell pled guilty to conspiracy to possess with intent to distribute over five kilograms of cocaine. He began cooperating with the government, and identified Placide as one of the people to whom he supplied cocaine. Brassell would later testify at Placide's trial that: (1) in August 1999, he twice sold five kilograms of cocaine to Placide; (2) in December 1999, he twice or thrice sold five kilograms of cocaine to Placide; and (3) in October 2000, he sold three kilograms of cocaine to Placide. On March 8, 2000, state and federal law enforcement officials executed an arrest warrant for Placide at his home in Nashville.

Following the arrest, police sought and obtained a warrant to search Placide's house. At some point before the warrant arrived, Placide's wife went outside to leave with her daughter. She testified at the suppression hearing that she saw Placide's checkbook atop their Ford Crown Victoria, which was parked in the driveway. Federal Customs Agent David McDance similarly testified that he saw the checkbook before the arrival of the warrant. Nashville Police Officer Jesse Burchwell testified, however, that the checkbook was found after the warrant had arrived. According to Burchwell, he and another officer searched a Ford Expedition and found various paperwork, including a checkbook, in the floorboard under the back seat. Both Placide and his wife testified that the checkbook was kept in the Crown Victoria, not the Expedition.

---

[*] The Honorable S. Arthur Spiegel, United States District Court, Southern District of Ohio, sitting by designation.

The checkbook contained several stubs of interest: one dated December 5, 2000, showing a voided payment of $874.50 payment for rent at the Nashboro Village apartment complex; another dated February 5, 2001, showing a $795 payment for rent at an unnamed apartment; and a third also dated February 5, 2001, showing a $50 payment for rent. Confronted with the check stubs by Burchwell, Placide admitted that "a girl had given cash and he had written a check because she needed a check," and he identified his beneficiary as Simone Lowe. Lowe was Placide's girlfriend, and he spent a lot of time at Lowe's apartment, to which he had a key, was free to come and go as he pleased, and in which he sometimes stayed the night. Burchwell crosschecked Lowe's name with the Nashville Electric Service, and was given the address of 931 Village Hills Drive.

Several officers were dispatched to Lowe's residence at 931 Village Hills Drive. Upon arriving, Officer John Donegan saw Lowe, toting only her purse, run from apartment 931 and get into the passenger seat of a car. Donegan noted that the car's driver was slumped in the seat, such that he was unaware that anyone was in the driver's seat until he had passed it. The driver was Lowe's sister, Felicia Burrell, who testified that after driving only about twenty feet, they were pulled over by Donegan and another officer who was riding with him. Donegan testified that he asked Lowe where she had just come from, and that she told him that she had spent the night before with a friend named Jennifer who lived at 930 Village Hills. When Donegan confronted her about the lease with her name on it, she admitted that she lived at 931 Village Hills. After Donegan left the scene to get a search warrant, the remaining officers—by this point numbering between eight and eleven—unleashed a K–9 police dog, who sniffed the car for drugs. Burrell and

Lowe were not arrested during the stop, and were allowed to leave once the dog had completed his task.

Meanwhile, averring that "[a]lso found in the paperwork [at Placide's house] was several checks paying the rent at the 931 Village Hills Dr. address and at least one check paying the rent on the garage at that location," Donegan sought and received a search warrant for Lowe's apartment and garage. Upon his return, the officers searched Lowe's apartment. In the living room closet, the officers found: (1) nearly forty pounds of marijuana; (2) three kilograms of cocaine; (3) five kilograms of cutting agent; (4) a variety of drug paraphernalia; (5) two unloaded semiautomatic weapons; (6) three large bulletproof vests; and (7) a few items of mail addressed to Placide. Although Donegan acknowledged that all of the contraband that he found in the closet was stored in some type of bag, he also noted that "the cocaine itself was open so as soon as you opened the doors, you could actually see it and you could smell it. I mean the smell was horrendous. As soon as you opened the doors, it would literally knock you out." Burchwell also testified that when he opened the living room closet, he smelled a "strong odor of marijuana."

Officials also uncovered evidence in other areas of Lowe's apartment. In the garage was a Mercedes–Benz—registered to Placide's wife—which contained a photograph of Placide and Lowe. The laundry room contained two unloaded firearms, which were in their cases, as well as a kilogram of cutting agent. In the refrigerator, the officers found another kilogram of cutting agent. In the pantry, they found drug paraphernalia, along with a liquor box containing two vacuum-sealed bags, each containing $7,500 cash. In the bedroom, the officers found a compartment behind the bed's headboard, which con-

tained a small amount of marijuana and two firearms, at least one of which was loaded. In the dresser, they found $500 cash, and a purse containing two packages of cocaine weighing a total of 156.2 grams and a "stick-it" note that said "Simone, four bumps, 3–1–01" ("bump" is slang for an individual serving of a drug). The officers also uncovered, throughout the apartment, an array of ammunition and a few photographs of Placide and Lowe.

## II. ANALYSIS

We analyze the claims of each defendant separately.

### A. Placide

Placide contends that: (1) the district court erred in denying his motion to suppress; (2) the evidence was insufficient to convict him of the charges stemming from his conspiracy with Brassell; and (3) the district court erred in denying his motion for a judgment of acquittal on the firearms charges.

#### 1. Motion to Suppress

■ Placide argues that because the checkbook, which linked Placide to Lowe, was seized illegally, the evidence discovered at Lowe's apartment was poisonous fruit. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He is correct that without the checkbook, the police would have lacked any evidence linking Placide to Lowe or her apartment. As for the checkbook itself, his argument is that the district court's factual finding—that the checkbook was not seized until after the search warrant arrived—was clearly erroneous. The district court was presented with competing versions of the events: Burchwell and FBI Agent Greg Thomason testified that the warrant came before the checkbook,

whereas McDance and Placide's wife said otherwise.

We lack any significant basis to say that the district court got it clearly wrong. *See United States v. Lawrence,* 308 F.3d 623, 626 (6th Cir.2002) ("[W]hen there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.") (internal quotations omitted). The district court noted that McDance seemed confused about many of the day's events and that the certainty of his testimony regarding the checkbook seizure contrasted with his general lack of memory about numerous other events. The district court also noted that Placide's wife would have been naturally biased towards her husband. The district court was within its discretion in crediting the testimony of Thomason and Burchwell over testimony of McDance and Placide's wife.

#### 2. Sufficiency of the Evidence on Charges from the February 22 Indictment

■ In the multi-person February 22 indictment, arising out of Placide's ventures with Brassell, Placide was charged with conspiracy to possess with intent to distribute over five kilograms of cocaine. Placide acknowledges that Brassell testified to selling Placide five kilograms of cocaine on four to five occasions, and three kilograms on another—making for a total of at least twenty-three kilograms. Placide argues, however, that because "Brassell also testified that he had other customers than Placide and that he sold marijuana in addition to cocaine," and because "Brassell would use various code names in reference to cocaine, marijuana, or cash," then "[i]t is just as likely that some of the amounts may have actually been marijuana." Yet Brassell never expressed any doubt that he dealt Placide

cocaine and only cocaine. In reviewing evidentiary sufficiency, we evaluate only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). A jury could very well have questioned Brassell's memory and/or bookkeeping, but given the standard of review Placide's argument would have to that anyone dealing two substances to various customers is inherently—as a matter of law—incapable of keeping track. This sweeping proposition would prevent the introduction of all sales-related evidence from diversified merchants, a result that we are unwilling to endorse. Accordingly, the evidence was sufficient.

### 3. Firearms charges

■ Placide also argues that there was insufficient evidence to show that he violated 18 U.S.C. § 924(c). The statute prohibits the possession of a firearm, "in furtherance of any" drug trafficking. Placide challenges only the satisfaction of the "in furtherance" element of the statute. To be used "in furtherance," "the weapon must promote or facilitate the crime." *United States v. Mackey,* 265 F.3d 457, 461 (6th Cir.2001). Therefore, "the possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *Id.* at 462. That said, under the so-called fortress theory, "[w]hen guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun, whether kept for protection from robbery of drug-sale proceeds, or to enforce payment for drugs, may reasonably be considered to be possessed 'in furtherance of' an ongoing drug-trafficking crime." *United States v. Garner,* 338 F.3d 78, 81 (1st Cir.2003).

Although a variety of weapons were found in the apartment, the only weapons that were loaded and ready to use were stored away from the drugs. All of the drugs found (except for very small personal use quantities) were found in the closet. The weapons found in the closet, however, were unloaded, which would have made it more difficult for the jury to infer that the guns were used to protect the drugs when they were in the apartment. *See Lawrence,* 308 F.3d at 630. Yet also in the closet alongside the drugs were guns, ammunition, and large bullet-proof vests, such that the jury could have inferred that Placide used the guns, ammunition, and vests for protection when he transported the drugs. *See id.* at 631 (contemplating liability if defendant "intended to use the machine gun in future dealings").

### B. Lowe

Lowe argues that: (1) the district court erred in denying her motion to suppress; (2) there was insufficient evidence to convict her of any and all of the charges; and (3) the district court clearly erred in refusing to grant her a sentence reduction for acceptance of responsibility.

### 1. Motion to Suppress

Lowe first challenges the seizure of the checkbook from Placide's car, arguing that the search of her apartment was tainted fruit of the illegal search of the checkbook. During the suppression hearing before the district court, Lowe withdrew her challenge to the search of Placide's car, acknowledging that she lacked standing to challenge a search of a car that she never owned, possessed or used. *See, e.g., United States v. Williams,* 354 F.3d 497, 511 (6th Cir.2003) ("This Court has twice held

that *Wong Sun* precludes the argument that a defendant is entitled to the suppression of evidence simply because it is the fruit of a violation of his co-defendant's Fourth Amendment rights."). Lowe now raises the challenge again, apparently undeterred by the fatal standing defect that she herself acknowledged below. Yet, inexplicably, the Government's brief fails to raise her lack of standing, and thereby waives the argument. *See United States v. Corrado*, 304 F.3d 593, 611 n. 12 (6th Cir.2002). In any event, Lowe's argument about the checkbook—that the district court clearly erred in finding that the checkbook was seized after the warrant's arrival—is the same argument that we rejected when advanced by Placide.

■ Second, Lowe argues that the police had no basis to stop the car in which she was a passenger, such that any information or testimony garnered therefrom—particularly, Lowe's initial denial that she lived at 931 Village Hills Drive—must be suppressed. The Government contends that the officers conducted a *Terry* stop that was supported by reasonable, articulable suspicion. Be it the stop of a person or an automobile, "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Hurst*, 228 F.3d 751, 756–57 (6th Cir.2000). At the time of the stop, Donegan knew that: (1) the apartment from which Lowe was leaving was paid for by a drug trafficker; (2) Lowe was hurrying from the apartment; and (3) the driver of the car that Lowe entered was crouching in her seat, such that Donegan could barely see her. Although none of these circumstances would have been sufficient individually, together they could allow an officer to suspect that Lowe was partaking in a drug deal with the car's driver. *See United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir.2002) ("[T]he district court erred by analyzing each of these circumstances individually, rather than basing its decision on their totality.").

■ Finally, Lowe argues that under *Franks v. Deleware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the affidavit used to obtain the warrant for the search of her apartment contained statements that were "false or recklessly made and were furthermore material to the establishing of probable cause." Under *Franks*, "the hearing court must strike from the warrant affidavit statements that the defendant can prove by a preponderance of the evidence to be both (a) materially false and (b) made with reckless or intentional disregard for their falsity. If the redacted affidavit, purged of recklessly and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid." *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir.2002).

Although the affidavit contained an inaccurate statement—that checks were found at Placide's residence that had Lowe's address on them—the inaccuracy was immaterial. Burchwell had found stubs with the name of a certain apartment complex, had received Lowe's name from Placide, and had learned Lowe's address from the electric company. Functionally, the information contained in the affidavit was the same, although it was missing a few intermediate steps. In any event, there was no evidence that Donegan intentionally or recklessly provided the inaccuracy. Donegan testified, and the district court found, that he received the information from Burchwell and had no reason to doubt its truth. And there was nothing about the information, on its face, that suggested

something was amiss. Burchwell had overseen the search of Placide's residence, including the cars, and Donegan reasonably assumed that what Burchwell told him was indeed accurate.

### 2. Sufficiency of the Evidence

Lowe next asserts that her convictions on each of the charges were supported by insufficient evidence. Her convictions fall into three categories: (1) possession with intent to distribute; (2) conspiracy to possess with intent to distribute; and (3) possession of a firearm in furtherance of a drug-trafficking offense.

■ First, Lowe argues that the evidence indicates only possession, not possession with intent to distribute. Although only personal use quantities of drugs were located in Lowe's bedroom, large amounts of drugs and paraphernalia were found throughout her apartment. Generally, "a jury is entitled to infer that a person exercises constructive possession over items found in h[er] home." *United States v. Hill*, 142 F.3d 305, 312 (6th Cir.1998). Similarly, many drug-distribution accessories were found in Lowe's kitchen, including a kilogram of cutting powder, scales, rubber gloves, and vacuum-seal bags. *See United States v. Welch*, 97 F.3d 142, 151 (6th Cir.1996) (sufficient evidence when defendant was found along with three others in apartment with "a good sized amount of cocaine ... and crack processing equipment"). Finally, the drugs in the closet emanated such a stench, according to police testimony, that a jury could have reasonably found that Lowe knew of their presence. In sum, a jury could reasonably conclude that Lowe and Placide had an arrangement in which Placide paid part of Lowe's rent in exchange for a venue for his drug distribution operation. And "[p]roof of actual possession with intent to distribute is not necessary to sustain a conviction under 21 U.S.C. § 841(a)(1) as long as there is proof, beyond a reasonable doubt, that a defendant aided and abetted the criminal venture." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir.1991) (per curiam).

■ Second, this evidence supports the jury's finding that Lowe conspired to possess with intent to distribute. To demonstrate a conspiracy, the Government must show: "(1) an agreement to violate the drug laws; (2) knowledge and intent to the join the conspiracy; and (3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.1999) (internal quotations omitted). "It is ... not necessary for the government to prove the existence of a formal agreement; evidence of a tacit agreement or mutual understanding is sufficient to demonstrate a conspiracy." *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993). For the reasons we noted above, a jury certainly could have concluded that Lowe agreed to allow Placide to store his distribution-quantities of drugs in her apartment.

■ Third, Lowe challenges her conviction for possession of a firearm in furtherance of a drug-trafficking offense. 18 U.S.C. § 2 provides that anyone who aids and abets the commission of a crime may be treated (and punished) as if they were a principal. As we noted above, Lowe provided Placide with the use of her apartment for his storage needs, which included the storage of an array of weapons and ammunition that he used in furtherance of drug transactions. Whether or not Lowe directly possessed the weapons in furtherance of a drug transaction, she clearly aided and abetted Placide's doing so.

### 3. Acceptance of Responsibility

■ Finally, Lowe argues that the district court erred in refusing to grant her a

downward departure due to acceptance of responsibility. We may reverse only if the district court's refusal was clearly erroneous. *United States v. Price,* 258 F.3d 539, 547 (6th Cir.2001). "The sentencing guidelines provide that a defendant is entitled to a two-level reduction in sentence if he 'clearly demonstrates acceptance of responsibility for his offense.'" *United States v. Maliszewski,* 161 F.3d 992, 1023–24 (6th Cir.1998). The Commentary to this provision indicates that it "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."

Because she has done just that, Lowe is seemingly ineligible. The Commentary does provide that a defendant may still qualify for the departure if she "goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct.)" Lowe claims that she went to trial to preserve the search and seizure issue. But at trial, Lowe also contested whether and to what extent she participated in the drug conspiracy with Placide. *See id.* at 1024 (noting that the defendant "did not make any factual stipulations during the trial"). And she continues to do so on appeal. Finally, Lowe's post-trial expression of remorse never actually admitted to the specific conduct of which she was convicted. In a written statement that she submitted to the district court, Lowe maintained that:

> As an American citizen, I chose to exercise my constitutional right to a trial by jury. It was my intent to preserve issues including but not limited to the search and seizure issue which was raised prior to trial. . . . It is further my intent to appeal my conviction on issues including but not limited to the search and seizure. . . . I am extremely apologetic for my actions which led to my trial and ultimate conviction. I have endured a tremendous amount of shame and embarrassment as a result of the events of the past year. In addition, I have caused my family a great deal of disappointment in me. There are no words which will be able to express how remorseful I am.

*Cf. id.* (unmoved when the defendant's "expression of remorse and guilt were tepid . . . he stated only that he felt 'pretty bad.'"). Lowe's faint acceptance of responsibility fails to demonstrate that the district court clearly erred.

### C. Sentencing

Although the base offense levels of both Placide and Lowe were calculated using determinations of the quantities of drugs implicated by their conduct—findings that were made by a judge, not a jury—our decision in *United States v. Koch,* 383 F.3d 436 (6th Cir.2004), holds that the constitutionality of the Federal Sentencing Guidelines is unaffected by the Supreme Court's decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

### III. CONCLUSION

For the preceding reasons, the judgment of the district court is **AFFIRMED**.